Carlos Romero BARCELO, Governor of Puerto Rico, et al., Plaintiffs,

Carlos Zenon et al.,
Plaintiffs-Intervenors,

v.

Harold BROWN et al., Defendants.

Luis MEDINA et al., Plaintiffs,

Fundacion Arqueologica, Antropologica E Historica De Puerto Rico,
Plaintiff-Intervenor,

v.

Harold BROWN et al., Defendants.

Civ. Nos. 78–323, 78–377.

United States District Court,
D. Puerto Rico.

Sept. 17, 1979.

Miguel Gimenez Munoz, Secretary of Justice, Commonwealth of Puerto Rico, San Juan, Puerto Rico; Gerardo A. Carlo, Special Counsel to the Governor, Commonwealth of Puerto Rico, La Fortaleza, San Juan, Puerto Rico; Lewis A. Rivlin, John A. Hodges, Sanda M. Kayden, Peabody, Rivlin, Lambert & Meyers, Washington, D.C.; Timothy L. Harker, Washington, D.C.; Jorge L. Cordova, Charles R. Work, Collister Johnson, Theodore A. Miles, Washington, D.C. (of counsel), for plaintiffs Carlos Romero-Barcelo, Governor of Puerto Rico, *et al.*

Pedro J. Saade Llorens, Servicio Legales, Santurce, Puerto Rico, for plaintiffs-intervenors Zenon, *et al.*

Judith Berkan and Pedro J. Varela, Hato Rey, Puerto Rico, for plaintiffs Medina, *et al.*

Wilfredo A. Geigel, Santurce, Puerto Rico, for plaintiff-intervenor Fundacion Arqueologica, Antropologica e Historica de Puerto Rico.

---

1. These Plaintiffs will hereinafter be collectively referred to as "Plaintiffs Romero-Barceló, et al."

2. See 12 L.P.R.A. § 1131; *Commonwealth of Puerto Rico v. S. S. Zoe Colocotroni*, 456 F.Supp. 1327, 1337 (D.P.R.1978).

Julio Morales Sanchez, U.S. Atty., San Juan, P. R., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

In substance, these suits concern the military use by the United States Navy of land which it owns in the Island of Vieques, a civilian municipality of the Commonwealth of Puerto Rico. They bring into focus the delicate and complex constitutional interplay that exists between our three branches of Government, as well as between the Federal and local establishments and its citizens.

### I. *Procedural Preface*

The parties to these actions are as varied and as multifarious as the issues which they raise.

In Civil Number 78–323 the Plaintiffs[1] are Carlos Romero Barceló, who is the Governor of the Commonwealth of Puerto Rico, Radamés Tirado Guevara, the Mayor of Vieques, and the Environmental Quality Board, an administrative agency of the Commonwealth charged by law with protection of the environment in Puerto Rico.[2] The Defendants in that suit are Harold Brown, Secretary of Defense of the United States, W. Graham Claytor, Jr., the Secretary of the Navy, James L. Holloway, Chief of Naval Operations, I. C. Kidd, Jr., Commander in Chief of the Atlantic Fleet, and Louis H. Wilson, Commandant of the Marine Corps.[3] After the commencement of this suit on March 1, 1978, additional Plaintiffs sought and received permission to intervene. They were Carlos A. Zenón, Mario Félix, Mariano Rivera Guishard, Alicio Ayala Soto, Francisco Medina Meléndez, Esmeraldo Meléndez and Santos Ríos, fishermen who are residents of Vieques, and the "Aso-

3. These Defendants, together with other Defendants mentioned in Civil Number 78–377, will hereinafter be collectively referred to as "Defendant Navy."

ciación de Pescadores de Vieques, Inc.", a cooperative of Vieques fishermen.[4]

The Plaintiffs in Civil Number 78–377, which was filed on March 8, 1978, are Luis Medina, Jesús Medina, Mario Antolino Félix, Cristóbal Medina, Severino Ventura Cintrón, Héctor Medina, Cristóbal Medina, Jr., Enrique García, Antonio Ayala González, Angel Ventura, and Daniel Medina, all fishermen and/or residents of Vieques, and Misión Industrial de Puerto Rico, Inc., an entity which is allegedly interested in advocating environmental causes.[5] Intervention was also sought and allowed in this case on behalf of "Fundación Arqueológica, Antropológica e Histórica de Puerto Rico", a non-profit corporation involved in research and preservation of historical and prehistorical cultural resources.[6] The Defendants in this suit are the same as those in Civil Number 78–323, except for the addition of William R. Flannagan, Caribbean Commander of the Atlantic Fleet, Swain Wilson, Commandant of the United States Coast Guard, and unnamed John Doe Defendants.

After various preliminary procedural interchanges, including a hearing in which a request for a temporary restraining order was denied in Civil Number 78–377, Civil Numbers 78–323 and 78–377 were consolidated. It is appropriate to briefly set forth the allegations in the various complaints.

Plaintiffs seek to enjoin Defendant Navy from using any portion of its lands in Vieques, or in the waters which surround this Island, for the purpose of carrying out naval training operations. Broadly speaking, the complaints allege harm to all residents of Vieques, to its fishing and agricultural industries, to certain endangered species of plant and wildlife, to officially designated and unidentified historical sites and to private property, all as a consequence of Defendant Navy's activities.

The main thrust of Plaintiffs Romero Barceló's allegations in Civil Number 78–323 is related to claims of violation by Defendant Navy of various environmental laws. These claims include the alleged failure of Defendant Navy to prepare and file an environmental impact statement pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321 et seq.), as well as other substantive offenses thereunder, and alleged violation of the Federal Water Pollution Control Act of 1972 (33 U.S.C. § 1311), the Water Pollution Control Act of Puerto Rico (24 L.P.R.A. §§ 591, et seq.), Public Policy Environmental Act (12 L.P.R.A. §§ 1121 et seq.), and Executive Order No. 11752 (38 F.R. 34793); the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. §§ 1401, 1411 and 1412); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Noise Control Act of 1972 (42 U.S.C. §§ 4901 et seq.) and the general Nuisance Law of Puerto Rico (33 L.P.R.A. § 1365); the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.); the Endangered Species Act of 1973 (16 U.S.C. §§ 1531 et seq.); the National Historic Preservation Act (16 U.S.C. §§ 470 et seq.), and Executive Order 11593 (36 F.R. 8921); the Coastal Zone Management Act (16 U.S.C. §§ 1451 et seq.); the Marine Mammal Protection Act of 1972 (16 U.S.C. §§ 1361, et seq.); the Rivers and Harbors Act of 1899 (33 U.S.C. § 407); the First and Fifth Amendments to the Constitution, and Presidential Orders and Congressional restrictions relating to the transfer of military activities from the Island of Culebra, another off-shore municipality of the Commonwealth.[7] The allegations of Plaintiffs Zenón et al are substantially a copy of the complaint of Plaintiffs Romero Barceló et al, with the exception that additional contentions are made with regards to violations of the Federal Relations Act of 1950 (48

---

4. These Plaintiffs-Intervenors will hereinafter be collectively referred to as "Plaintiffs Zenón, et al."

5. These Plaintiffs will hereinafter be collectively referred to as "Plaintiffs Medina, et al."

6. This Plaintiff-Intervenor will hereinafter be referred to as "Plaintiff Fundación."

7. See *Feliciano v. United States*, 297 F.Supp. 1356 (D.P.R.1969), aff'd, 422 F.2d 943 (C.A. 1, 1970), cert. den. 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970).

U.S.C. § 749) and the Water Law of Puerto Rico (12 L.P.R.A. §§ 1501–1523).

In Civil Number 78–377 Plaintiffs Medina et al, in addition to also relying on the previously enumerated claims, allege various other basis for relief, including a challenge to the taking and acquisition by Defendant Navy of the land on which the activities subject of these suits are carried out, allegations of violation of the Organic Act of 1900 ("Foraker Act") (31 Stat. 77), the Organic Act of 1917 ("Jones Act") (39 Stat. 951), the Federal Relations Act (64 Stat. 319, 48 U.S.C. § 731 et seq.), and of certain treaties (15 U.S.T. 1636), by virtue of Defendant Navy's use of the navigable waters surrounding Vieques, and claims for damages arising by reason of Defendant Navy's allegedly intentional and/or negligent actions, which claims are ostensibly grounded on the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.). The contentions of Plaintiff Fundación are similar to parallel ones by Plaintiff Romero Barceló et al, based on the National Historic Preservation Act of 1966, supra, and Executive Order 11593, supra.

For the present moment, suffice it to say that Defendant Navy's answers put at issue Plaintiffs' allegations and resulted in a trial lasting three months in duration. Sixty three witnesses, many of them leading authorities in various fields of expertise, as well as hundreds of exhibits were presented during the course of this legal marathon. Additionally, at the request of the parties, the Court conducted two field trips to various sites in and around Vieques. The Court consolidated the preliminary and permanent injunction hearings.

Because these cases present such an all-inclusive challenge to Defendant Navy's presence and activities in Vieques, we must commence our homeric voyage through this evidence with some relevant background discussion about the Island in question.

## II. Background

### A. Physical Biography

Vieques is a long narrow island located approximately 6 miles off the Southeastern coast of the main Island of Puerto Rico and about 9 miles due South of its sister municipality of Culebra. It is nearly 20 miles long and 4.5 miles wide at its widest point, and is oriented on an East-West axis. The Island has an area of about 33,000 acres or 51 square miles of land.

The topography of Vieques is dominated by a backbone of rolling hills several hundred feet in height leading up to Monte Pirata in its western extremity, which at nine hundred and eighty one feet is the highest point on the Island. The shores are principally composed of calcareous sandy beaches, interrupted by several rocky promontories, particularly in the eastern extremities, and in the points of the various half-moon bays located throughout the southern coast. There are fringe and off-shore coral reefs mostly in the northern, eastern and southern sectors.

The mean average temperature is 80° and the average annual rainfall is 46.23 inches, mostly concentrated in the central and western areas. There are no permanently flowing fresh water streams or rivers. Generally speaking the prevailing winds are from the East; however, they tend to bend towards the Northeast along the north coast and the South East along the southern shores.

The ocean and wave action follow a pattern similar to that of the wind. The ocean currents are also generally wind-oriented from East to West, but tidal flow can affect this pattern substantially, particularly in the eastern and western extremities of the Island where the tide moves north when ebbing and south when flooding.

The biota of Vieques is typical of a Caribbean Island with low population density but contains some unique features as well.

The flora is in large part determined by the various humidity zones as well as the present land use, a matter we shall presently deal with in greater detail. Suffice it to say for the moment that it generally tends to run from thorny brush in the East to lusher vegetation in the West, the central strip being subjected to some cultivation of

minor crops. Scrub grass covers much of the bare ground throughout Vieques. There are several large stands of mangrove along the coast, the most important of which are in the vicinity of Punta Arenas in the West, and surrounding Puerto Mosquito, Puerto Ferro and Ensenada Honda on the South. Inland from these are generally found dryland forests of ucar (*Bucida buceras*). Many areas of the ocean floor in the immediate vicinity of the coast are covered with stands of sea grasses, mostly of the *thalassia* variety, the largest of these concentration starting West from Punta Caballo on the North coast and fanning around Punta Arenas to the South West. There are also large seagrass areas in the South in Ensenada Honda and in Bahia Salinas del Sur.

Vieques' animal life includes several species of particular interest to the present action. In addition to the usual complement of fish and bird population[8] there are present in Vieques six species which are designated as either "endangered" or "threatened" pursuant to statute or regulations.[9] These are the brown pelican (*Pelecanus occidentalis*),[10] the manatee (*Trichechus manatus*),[11] the leatherback turtle (*Dermochelys cariocea*),[12] the hawksbill turtle (*Eretmochelys imbricata*),[13] the loggerhead turtle (*Caretta caretta*),[14] and the green turtle (*Chelonia mydas*).[15]

Three coves in the Southern coast of Vieques (Puerto Mosquito, Puerto Ferro and Bahia Tapón) contain an unusual phenomena found occasionally[16] in protected shorelines of tropical waters, within very particular physical and biological parameters. This phenomena is known as bioluminescense, a process which has not been fully explored scientifically but which is believed to be related to the presence of microscopic dinoflagellate[17] activated by specific physical circumstances.

### B. Pre-History and History

A brief look at Vieques' pre-history and history will give us some insight into the problems we are faced with in the present case.

The first semi-permanent inhabitants of Vieques were Carib Indians. They arrived in the period immediately preceding the discovery of Vieques by Christopher Columbus (1493), and for various decades thereafter.[18] These sea-going tribes came up from the northern coast of South America via the Lesser Antilles and used Vièques as a base from which to carry out their fierce raids into Puerto Rico. Prior thereto, commencing as far back as perhaps 850 A.D., various migratory waves of Arawak Indians[19] which originated in the Orinoco Basin, passed through the Island on their way to more permanent abode in Puerto Rico and Hispanola. In historic times, Indians

8. There are no wild land mammals in Vieques other than rodents, mongooses, and bats. They, as well as the various resident species of land reptiles and crustacians, play no significant role in this controversy.

9. 16 U.S.C. §§ 1361 *et seq.*; 16 U.S.C. §§ 1531 *et seq.*

10. 35 Fed.Reg. 16047 and 18319, 50 C.F.R. § 17.11, p. 12. Puerto Rican residents of this species are a subspecies denominated *pelecanus occidentalis occidentalis*.

11. 16 U.S.C. § 1362(5); 50 C.F.R. 17.11 p. 59.

12. 50 C.F.R. 17.11 p. 80.

13. *Id.*

14. *Id.*

15. *Id.*

16. Only four other similar bays are known to exist in the World.

17. *Pyrodinioura bahamense* (Pyrcophyta-Dinoflagellata).

18. Some sources date the Carib's arrival to Vieques at about 1480. See Irving Rouse, "Scientific Survey of Porto Rico and the Virgin Islands", Volume XVIII, Part 4, page 565, New York Academy of Sciences, New York, 1952.

19. *Id.* Both the Igueri (Saladoid) and Taino cultures of the Arawaks were ceramic and agricultural, which are normally indicative of higher social organization. It is probable that pre-ceramic (Coroso) Indians preceded the Arawaks to Vieques, and perhaps also Ciboney Indians from Hispanola. *Id.* p. 570.

from Puerto Rico and St. Croix, Virgin Islands moved to Vieques to escape the Spanish conquest.[20] The Spanish forces sent to conquer Vieques had little influence on the native population living there and no attempt was made by Spain to colonize the Island at this point.

During the 17th and 18th Centuries the French, English, Dutch and Danes all attempted to establish footholds on Vieques. In 1673 the Spanish attacked and destroyed the colonial population and thereafter continued to send military expeditions from time to time. In 1816, colonists from Saint Thomas and St. Croix asked and received permission to establish a livestock industry in Vieques, and thus began what is today the Island's dominant agricultural activity. One year later the Governor of Puerto Rico delegated authority to one of these colonists and thereafter a fort was built at Isabel Segunda, the capital of Vieques. By 1828 the population of Vieques was 122 engaged mostly in timber harvesting for export to the Virgin Islands, in the growing of crops and livestock, and in fishing. After 1869, economic activity increased and sugar cane became the leading crop.

In 1898, and as a result of the Spanish-American War Vieques together with the rest of the present-day Commonwealth of Puerto Rico became a territory of the United States.[21] Through the early 1940's, the principal activities in Vieques were the growing of sugar cane and livestock, and fishing. The total population throughout this period fluctuated between 6,000 and 12,000. The population of Vieques according to the 1970 census, was 7,767 persons of which 2,378 lived in Isabel Segunda and 620 in Esperanza, the Island's two towns, and 4,769 were classified as rural inhabitants. Sugar is no longer of any relevance, and the principal agricultural endeavours are relat-

ed to the planting of some minor crops, and to livestock. Fishing is still of importance to the local inhabitants.

As previously stated, Vieques is a civilian municipality of the Commonwealth of Puerto Rico. It is divided into seven wards ("barrios"): Puerto Diablo, Puerto Ferro, Puerto Real, Florida, Mosquito, Llave and Punta Arenas. During the period from 1939 to 1944, Defendant Navy acquired title by purchase to 26,000 of the 33,000 total acres of Vieques. This property is physically divided into two sections and is bisected by the civilian area of Vieques. (See Appendix A).

The eastern part of the naval reservation includes Barrio Puerto Diablo and most of Barrio Puerto Ferro. The western part begins at a north-south line which commences west of Punta Caballo and continues south to the eastern end of Laguna Playa Grande. It includes the barrios of Punta Arenas, part of Mosquito, Llave and Florida. There is also an additional area in the middle of civilian sector known as Barriada Monte Santo, to which Defendant Navy holds title but in which there has been considerable civilian squatting with Defendant Navy's knowledge and acquiescence.[22]

### III. *Defendant Navy's Activities in and around Vieques*

Generally speaking, in the eastern sector are located a Marine Corps facility known as Camp García, a 5000 foot airstrip not presently in active use, a heliport, a field ammunition depot, the bulk of the beaches used for amphibious landings, an observation post complex on top of Cerro Matías, and the various ordinance impact zones, with related targets. The western sector is mainly used for the storage of ammunition in the bunkers spread throughout this area,

---

**20.** Ironically, in recent times many present day inhabitants of Vieques have migrated to St. Croix.

**21.** See Treaty of Paris of 1898, Art. II, 1 L.P. R.A. Historical Documents, p. 17; see also, *Balzac v. Porto Rico*, 258 U.S. 298, 305, 42 S.Ct. 343, 66 L.Ed. 627 (1922).

**22.** This parcel, together with various other parcels in the other two sectors of Defendant Navy's Vieques properties, have been declared surplus property and turned over to the General Services Administration, who has for some time been conducting interminable negotiations with the Commonwealth Government for their transfer.

as well as for quarrying, some amphibious operations, and some of the non-firing small unit training. Also in this sector is located a breakwater-pier at Desembarcadero Mosquito, an administrative center, and an electronic warfare facility on the summit of Monte Pirata.

Defendant Navy's properties in Vieques are part of a much larger and inclusive military complex known as the Atlantic Fleet Weapons Training Range, which consists of four ranges: the inner range in the east end of Vieques, previously alluded to; the outer range, which is an ocean range extending both north and south of Puerto Rico and to the east; the underwater tracking range at St. Croix, Virgin Islands; and an electronic warfare range. All of the operations of these various ranges are directed from a center located at the Roosevelt Roads Naval Station in Ceiba, Puerto Rico, approximately 7 miles northeast of Vieques across Vieques Sound.

The outer range is at least 35 miles north of Vieques and 20 miles to the south. On this range are conducted various surface and anti-aircraft gunnery exercises as well as missile exercises, including surface-to-air, surface-to-surface, air-to-surface and air-to-air training.

The underwater tracking range is located in waters varying in depth from 200 fathoms to 500 fathoms off the western shore of St. Croix (and southeast of Vieques), and encompasses 21 square nautical miles. This range is used for training for accurate three-dimensional tracking of surface and underwater objects.

The electronic warfare range is a complex of so-called threat platform simulators located at various sites in Puerto Rico and adjacent islands, including Monte Pirata as previously stated, as well from one sea-going location. These facilities provide a realistic electronic environment for the training of shipboard electronic warfare teams and tactical electronic order-of-battle, in support of exercises and operations conducted on the various other ranges.

## A. *The inner range*

The inner range (see Appendix B), which consists of air-to-ground, ship-to-shore, and artillery targets, is locally controlled from the observation post previously mentioned atop Cerro Matías. The post is surrounded by a 1200 yard safety zone into which no ordnance may be discharged.

The public is notified that the range will be used through notices to airmen, notices to mariners and fishermen's notices. Fishermen's notices indicate the schedule of activities for the following week and include a map of the island of Vieques for aid to the reader in determining the activated areas. These notices are widely distributed and posted, including at the fishermen's cooperative. In the event of a change in activities, a written schedule is printed and distributed at least 24 hours in advance to fishermen. Defendant Navy does not restrict access to the waters in the danger zone [23] at Vieques except shortly prior to, during, and immediately after training operations utilizing these waters.

---

**23.** As a further warning device regarding the danger zone, Defendant Navy has placed a buoy at the western edge of the danger zone in the southern coast, established under 33 C.F.R. 204.234. The buoy consists of 3 yellow balls, each about 4 feet in diameter, welded together, on which there is a triangular warning sign.

There are two restricted areas (see 33 C.F.R. 207.815(2), (3)), in the coastal waters off Vieques, activated at all times: one on the south coast around the Camp García area, extending 1,500 yards offshore; and a second one around the Naval Ammunition Facility at the west end of the Island, including Mosquito Pier, extending 1,500 yards offshore.

Defendant Navy has both CB radios and a VHF unit for communication with the fisher-

men. In fact, Defendant Navy installed a VHF unit in the fishermen's cooperative for their use in contacting the observation post atop Cerro Matías. This has proven to be a useless gesture as the fishermen either refuse or neglect to make use of this facility.

On shore, there are warning signs in Spanish and English posted at intervals along the entire length of the cattle fence which acts as the western boundary of the inner range. Signs are also posted along the beaches.

There is a guard at the main gate of Camp García to prevent the entry of unauthorized personnel into the eastern end of the Vieques Naval properties. The cattle fence is patrolled.

This range normally opens at 7:30 A.M., with firing commencing at 8:00 A.M., and usually closes at 10:00 P.M.[24] When the range is active, a red eight-foot square flag is flown from a 15 foot pole above the observation post during the daylight hours, and a red rotating beacon is operated at all times. Prior to commencing range use, a patrol aircraft covers the water areas around the Island to assure that the area is clear. When required, a patrol boat is also used for this purpose. The range control officer on location can visually observe the entire land mass area and the surrounding sea and air space for considerable distances.[25] Additionally, there are two radars observing the surface water area and to maintain the position of ships while firing on the range.[26]

In the event of unauthorized entry on the range while the same is in use, the range officer immediately halts the firing and personnel is dispatched to clear the range fouler. The United States Coast Guard provides assistance for such contingencies in the danger areas of the surrounding waters.

There have been occasions when ships or aircraft have disregarded safety precautions incorporated in the range user's manual or the range officer's instructions. The range officer has authority, which has in fact been exercised at times, to order an offender off the range.

In addition to fire control and related safety measures, one of the principal functions of the observation post is the scoring of the firing. This is accomplished visually, in the case of ship-to-shore firing, and by television in the case of air-to-ground bombing.

The eastern boundary of the inner range is a north-south fire break, approximately 20 meters in width, running from a point just west of Bahía Playa Blanca and continuing directly south to the shore west of Cerro Indio. This boundary is referred to by Defendant Navy as the "Eastern Friendly Front Line." No ordnance is used east of this demarcation. Immediately to the west of this line commences the Air Impact Area and Close Air Support Zone (AIA/CAS) which extends west to another north-south fire break known as the "Western Friendly Front Line." This line commences on the shore of Bahía Icacos and runs directly south past the eastern edge of an unnamed lagoon, to the beach at Bahía Salinas del Sur. The area between the two "Friendly Lines" is also known as the Naval Gunfire Support Range (NGFS). West of the Western Friendly Front Line is the Surface Impact Area (SIA) which runs to another north-south boundary commencing from a point west of Bahía Fanduca in the south, to the north shore three fourths a mile east of Puerto Diablo. A cattle fence, which is approximately 1,000 yards west and parallel to this SIA boundary, marks the western most extension of the inner range.

Since most of the controversies in this case arise out of Defendant Navy's activities within inner range, we shall describe these and the facilities therein located with greater detail.

#### (1) *The targets*

The inner range contains two bullseye targets, referred to as Targets 1 and 2. These are used for inert ordnance practice with Mark 76 practice bombs[27] and 2.75 mm. inert rockets. Live ordnance is never used on these targets. Target 1 is located approximately half way up on the Western Friendly Front Line. It is 400 feet in diameter and consists of 4 concentric rings of tires, 50 feet apart. Target 2, which is made up of three similar rings 300 feet in

---

**24.** Operations are authorized until 11:00 P.M. at a safety cushion. Exceptions have been made for naval gunfire exercises, and for air-to-ground operations with inert ordnance. In rare instances, the range has opened at 6:00 A.M.

**25.** For visual observation the range officer is usually assisted by binoculars. The range of unaided, accurate, line of sight observation from the observation post is approximately 5 miles on a clear day.

**26.** Aircraft are tracked by radar located at the Roosevelt Road center.

**27.** 250 pound bombs.

diameter, is located approximately two statute miles west of Target 1.

At the southern extremity of the Western Friendly Front Line is located a strafing target. Again, only inert ordnance is used against this target.

The AIA/CAS zones are the air-to-ground live ordnance target areas.[28] The targets consist of realistic mockups of an airstrip, a fuel farm, a motor pool, an ammunition dump, SAM rocket sites, and numerous targets of opportunity such as tanks, a convoy and airplanes. (See Appendix B).

There is also one stationary water target currently active[29] located about a mile off the eastern tip of Punta Este and consisting of a floating buoy. It was installed for inert, air-to-ground activity and has been used very infrequently.

A Mark 33 SEPTAR, which is an 18 foot drone target boat operated remotely from Cerro Matías, is sometimes operated in Bahía Salinas del Sur for air-to-ground exercises using inert ordnance.

In August of 1977 a target barge was anchored off the southeastern tip of Vieques for about a month. A guided 500 pound inert glide bomb called SMART ROC was fired at it.

All of the targets described above in the inner range, with the exception of the water targets, were installed and operational by the end of 1971. Some of the targets in the SIA and AIA were in use for some years prior to that.

#### (2) *Air-to-ground activities*

The type of aircraft usually involved in ordnance delivery on the AIA/FAS targets and on the two bullseye targets are A–4, A–6 and A–7 fix wing jet aircraft flying either from carriers lying offshore or from the Roosevelt Roads Station.

It is standard procedure to conduct safety and range use briefings for all range users, including air crews. These procedures are outlined in the range user's manual and will be discussed hereinafter.

Coming out of Roosevelt Roads aircraft take off on a heading of either 060° M and turn on a radial of 100° M headed out to an area 3 miles off the central Vieques coast. In a warning area north of Vieques known as Whiskey 428, the radial 100° M intersects Defendant Navy's operational area. Aircraft in this area must file a flight plan and are controlled by the Federal Aviation Administration (F.A.A.). At this point aircraft will be at about 6–7000 feet in altitude, climbing and proceeding easterly until they reach an area directly off Punta Este where they will begin a turn to the south. The aircraft must maintain altitude until they are inside a restricted area south of Vieques known as Romeo 7104, and then must descent immediately to an altitude of about 8000 feet and proceed over the target low enough to identify the same.

If the point of origin of aircraft coming into the inner range is an aircraft carrier operating in the north, they are required to pass through a designated area known as Point November, about 4 miles north of Vieques. The aircraft come in on a southerly heading through Point November at an altitude of between 12–15,000 feet. This altitude reservation is pre-established by agreement with the F.A.A.

If the aircraft carrier is operating to the south of Vieques, aircraft come in through Romeo 7104 as it lines up with Whiskey 428, in a two mile wide corridor on a northerly heading.

Normally aircraft come over the range area in groups of 3 or 4, 5 aircraft being the maximum that Targets 1 and 2 can handle in a pattern.

---

**28.** They also contain some targets against which only inert ordnance is allowed.

**29.** Sometime around 1976 a landing craft, the USS Killen, was anchored just north of Roca Alcatraz, in Bahía Salinas del Sur, and used as a floating target using live Mark 82 Series 500-

pound bombs. The ship was eventually leveled to the waterline and it broke-up and sunk sometime in the Spring of 1977. The wreck is presently sitting in two sections on the bottom of Bahía Salinas del Sur.

Aircraft loaded with either inert or live ordnance are not permitted by range regulations to overfly any civilian area, and no credible proof was presented during the trial of any practice to the contrary.

After the target identifying run, the aircraft must assume a course pointed at the designated target and with wings level, whereupon he is declared "cleared hot" after visual observation of the range control officer stationed at the observation post atop Cerro Matías.[30] Thereafter the pilot is permitted to arm the aircraft's master switch and to fire when he gets within the correct range. As the aircraft pulls off the target, it is required to advise the range officer that the master switch is on a "safe" position so that no ordnance may leave the plane. The minimum separation interval between different aircraft firing is 30 seconds. The second aircraft is not permitted to fire until the first aircraft over the target calls in that its master switch is "safe."

For bombing runs aircraft typically pass over target at about 1500 feet. In strafing, aircraft turn at about 3000 feet, fire at about 500 feet and pull out over the target at about 200 feet.

The course headings for the various targets are predetermined. The approach for Targets 1 and 2 and for the strafing target is from the south, on 010° M headings. Over Target 1 the pilot must make a right-hand turn off the target, except in instances where Target 2 is not activated when he may request a left-hand turn. The normal pattern for Target 2 is counterclockwise. In a left-hand turn off Target 2, the closest distance to the civilian sector is about 5.8 miles (to Barrio Santa María).[31] The approach to the AIA/CAS targets is also from

the south on courses of between 330° M and 030° M. Over the AIA/CAS targets the normal pattern is a right hand turn, although a left-hand turn can also be requested.

### (3) Ship-to-shore activities

As previously intimated ship-to-shore firing is also conducted in the inner range. This takes place into the same AIA/CAS zone, on six point targets located around the shoreline of Bahía Salina del Sur and on two area targets. As in the case of air-to-ground range users, ships crews must receive a briefing prior to arrival on the range.

Ships fire only from the waters to the south of Vieques. Upon arrival at the range, each ship must work its way through the range, visually identifying each one of the point targets and plotting them on a chart. The naval gunfire range can accommodate two ships maneuvering on the range at one time, but only one ship can fire at a time. During gunfire, except on rare occasions, the ships are between three to eleven miles from the shoreline. As previously stated, while firing the ship's position is monitored by the observation post's radar. Only live ordnance is used by ships as it has been found that inert naval ordnance creates a safety and scoring problem by its propensity to ricochet and its difficulty of observation.

When ship-to-shore firing is scheduled, air-to-ground activity is restricted to Target 2.

### (4) Field artillery

To the west of Cerro Matías is located the SIA, previously described, which is the Marine Corps artillery range.[32] This is the live

---

**30.** In the case of operations conducted during the night time hours, the target identifying run is preceded by the dropping of parachute illumination flares. An exception to this made for night radar bombing with light inert ordnance, which is conducted only by special permission and after the pilot has made daylight runs on the same target.

**31.** The width of a turn off Target 1 or 2 is about 1500–2000 yards offset from the Target rhumb

line, except that sometimes in a right turn off Target 1 the pilot extends the turn and comes out to the end of the Island.

**32.** This area has occasionally also been used for air-to-ground machine gun fire by Marine helicopter gun ships firing from west to east on targets on the side of a hill.

ordnance target area which is closest to the civilian populated areas. It is approximately 6.2 miles form Barrio Santa María. This type of practice involves the firing of howitzers, singly or in batteries, from positions along the vicinity of the SIA's western boundary toward targets near the Western Friendly Front Line, that is, from west to the east. Howitzer activity normally occurs only twice a year during the Marine amphibious exercises which will be subsequently discussed.

### B. *The Ground Maneuvering Area (GMA)*

The GMA is the principal Marine Corps training area in Vieques. This area is located within the zone comprised from the cattle fence previously described, which is the eastern boundary, all the way to the western property line contiguous to the civilian sector. The property line is marked by a chain link fence, topped by barbed wire.

### (1) *Camp García*

On the south western extremity of the GMA is the Marine camp previously referred to, Camp García. This camp has sufficient facilities to accommodate several thousand troops, although its present complement is about 150 men. Camp García has been operational since the early 1940's although improvements and additions have been carried out until recent times. The intensity of its use has fluctuated with the variated state of world affairs.

The airstrip which is adjunct to the base is operational but has only been used once in recent years and this was to allow an emergency landing by a civilian aircraft. Air transport to the base is conducted through a heliport located on a grassy field. The frequency of use of the heliport depends in large part on the training pressures of the GMA. Normal helicopter traffic in and out of Camp García, or the pads atop Monte Pirata and Cerro Matías, does not overfly the civilian sector of Vieques.

### (2) *Amphibious landings*

The GMA contains the beaches wherein the Marines conduct the bulk of their amphibious landings in Vieques.[33]

The principal landing beaches are called Red Beach and Blue Beach and are located on the south coast in an area designated as "Amphibious OP Area South", which runs from Punta Conejo on the east to Punta Negra on the west. Both beaches are immediately to the north of two cays approximately 2½ miles apart but which are confusingly enough both called "Cayo Chiva." Yellow Beach, which is south of Cerro Matías in the immediate vicinity of Punta Matías, is rarely used because of the other activities that are conducted in the SIA zone. On the north coast, in the "Amphibious OP Area North", is located Purple Beach between Punta Goleta and Punta Campanilla. Purple Beach is also used infrequently.

A typical landing exercise on OP Area South involves various support ships in the vicinity of the south coast off the restricted area south of Red and Blue Beaches. Those are large amphibious attack transports from which are launched the landing craft and amphibious tracked vehicles. These vessels proceed to the beaches where they land the troops as well as supporting tank, field artillery and vehicle units.

In recent years these exercises have included vertical envelopment landings by helicopter-borne troops. These are sometimes conducted independently of conventional amphibious operations. Those maneuvers include helicopter carriers within the supporting fleet. The troop landings take place inland of the conventional landing beaches.

---

**33.** Green Beach (Punta Arenas) on the north western extremity of Vieques is also a designated landing beach but has only rarely been used as such. It is in practice a recreational beach used in large part by both civilians from Vieques and weekend-visiting yachts from Puerto Rico notwithstanding its lying within the restricted area previously described in Note 23.

Landings are usually accompanied by realistic low-level support flights by Marine air units of fixed wing, jet aircraft or helicopter gunships. If ordnance is used, this is expended within AIA/CAS zone. Naval units may be involved in activities related to the NGFS area.

Upon landing the troops engage in various tactical maneuvers throughout the GMA related with the securing of predetermined objectives in the area. At times, the landings are opposed by "enemy" troops, which have periodically included units of the Puerto Rico National Guard. As part of these activities the howitzer exercises previously described are carried out.

After the exercises are completed, the troops and their equipment are normally embarked in the same manner as landed.

The amphibious exercises previously described usually take place throughout the year and in various degrees of complexity, involving from a score of men to various thousands of troops, and from one vessel to large supporting fleets. They can also be independent of other Naval activities or be part of "sequential" operations in which the different segments of a naval force (aircraft, ships and landings) are coordinated in a hopefully well-timed sequence.

C. *The Naval Ammunition Facility (NAF)*

As previously indicated, the NAF covers the entire portion of Vieques to the west of the civilian sector.

Before we discuss the principal activity in this area we should state that it contains a designated landing zone in the south western coast. This landing area is sometimes used for infiltration type exercises by small units.

The NAF is not properly a part of the Inner Range, although it may indirectly support its activities. It is a division of the weapons department of Roosevelt Roads and its main function is as a magazine for the storage of ammunition for both ship-to-shore and air-to-ground firing.[34] The principal "client" of the NAF is of course Defendant Navy, but it also stores ammunition for the Puerto Rico Air and Army National Guard.

A link wire fence, again topped by barbed wire, separates the NAF from the civilian sector. It has two guarded gates and its perimeter is secured by roving patrols.

Ordnance is stored in 102 bunkers spread throughout the NAF, of which only 76 are presently in use. They are an average of 450 feet away from each other and are designed and built in such a manner that if one were to explode, no damage would occur to another magazine or any off-station location (from which the nearest is 2000 feet away).[35]

The bunkers are periodically inspected by several levels of supervision, as often as on a monthly basis. The last major inspection of the magazines was conducted by the Naval Sea Systems Command on May 15, 1978. No deficiencies were found.

The ammunition is landed in Vieques from civilian cargo ships docking at Mosquito Pier in the north coast. There is also an ammunition anchorage area off this sector for ships that may have to await approaching the dock.

Ammunition may be moved from the NAF to the GMA through the civilian sector. This consists of anything from 5.56 caliber small arms rounds up to 175 millimeter howitzer ammunition.[36] Eighty-one

---

34. This storage is referred to as "deep storage" because the ordnance is placed there not for trans-shipment, but to remain on location until withdrawn for use. This ammunition is for contingency use only. A small percentage is actually used on Vieques itself.

Only conventional ordnance is stored in Vieques, although some dynamite is also kept there for blasting in quarries. No poisonous gas or nuclear weapons are stored in Vieques.

35. If a magazine with 30,000 pounds of explosives (a representative figure) were to explode, only minimal damage would be done to a building 1,250 feet away.

36. In the last twelve months, there have been eight issues of ammunition to the Marines at Camp García and six issues to Cerro Matías. The last movement of 155 or 175 millimeter ammunition to Camp García was on March 12, 1976.

millimeter white phosphorous smoke rounds are also occasionally moved to Cerro Matías. The ordnance is transported by pick-up trucks when it is small amounts, or in a larger truck when large amounts are involved, with an escort in front and in back. The ammunition-carrying vehicle is identified with a placard and red flags in accordance with Department of Transportation regulations. 49 C.F.R. 177.823. The boxes of ordnance are also marked with signs clearly signifying that they are mass detonating high explosives.[37] 49 C.F.R. 172.1 *et seq.* Prior to hauling ammunitions in a truck, the truck is inspected for 23 items by the driver. The drivers who haul ammunition are specially trained and tested. Only naval personnel who have been specially trained handle ordnance on Vieques.

Two overland routes are used to transport munitions from the NAF to the GMA. One is through the front gate on the north side of the Island and through Isabel Segunda. The second is through the back gate on the south side of Vieques, which route is used most frequently because it passes through areas with fewer people and less traffic.

There has not been any known accident from handling ammunition on Vieques.

We thus arrive to the legal issues raised by Plaintiffs' complaints.

## IV. *THE LEGAL ISSUES*

### A. *Preliminary Questions Raised by Defendant Navy's Motion to Dismiss*

Shortly before the commencement of trial Defendant Navy filed a Motion to Dismiss. Because of the tardiness of this filing the Court decided to take it under advisement and allow opposing counsel to file opposition thereto. No opposition was in fact filed, although some of the issues were covered by Plaintiffs Romero-Barceló et al. in their brief.[38]

### (1) *The Party Defendants*

All complaints except that of Plaintiff Fundación, attempt to state claims against Defendants in their individual as well as official capacities. These complaints however, are silent as to the personal involvement of any of these Defendants, nor do they specify what claims are stated against which Defendant in their individual capacities. The rule that constitutional and other claims against government officials in their individual capacities must be pleaded with specificity has thus been violated. *Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922 (C.A. 3, 1976).

Furthermore, it is well established that Federal officials are not vicariously liable for the acts of their subordinates, *Black v. United States*, 534 F.2d 524, 528 (C.A. 2, 1976), and Plaintiffs must show a direct involvement or responsibility on the part of each of the named Defendants in the action of which they complain. *Rizzo v. Goode*, 423 U.S. 362, 371, 375–376, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

On all these counts Plaintiffs have failed and thus the actions against Defendants as individuals must be dismissed.

The allegations in Plaintiffs Medina et al's complaint against "John Doe" and "Unknown Federal Agents" must also be dismissed as there is no provision in the Federal Rules of Civil Procedure for suit against persons under fictitious names. See: Rules

---

**37.** Mass detonating high explosives are those which detonate instantaneously if ignited. They are known as Class A explosives and carried in accordance with Department of Transportation regulations. 49 C.F.R. 173.1 *et seq.* We note that transportation of hazardous material apply only to carriers in commerce, see: 49 U.S.C. §§ 1801 *et seq.*; 49 C.F.R. 171.1.

**38.** Plaintiffs Medina et al. and Zenón et al. have in fact refused to file any post trial brief or proposed findings, all in violation of specific orders of this Court. These Plaintiffs, who were allowed to litigate *in forma pauperis* and supplied with daily copy of the trial record at considerable public expense, sought voluntary dismissal without prejudice after the trial had ended. This action which we consider to have been taken in bad faith by said Plaintiffs, was denied by the Court.

4(d)(1); 10(a), 17(a) Fed.R.Civ.P.; *Mc-Donald v. General Mills, Inc.,* 387 F.Supp. 24, 33 (E.D.Cal., 1974).

#### (2) *The actions that seek damages for allegedly tortious conduct*

■ Although the United States is not named as a party Defendant, the various nuisance and tort claims are in reality claims against the sovereign. In determining this, we are not bound by the naming of individual Defendants nor by Plaintiffs' characterization of the suit. *Sportique Fashions, Inc. v. Sullivan,* 421 F.Supp. 302, 305 (N.D.Cal., 1976). Pursuant to *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), a suit is deemed to be against the sovereign if the judgment would expend itself on the public treasury or interfere with public administration. See also *Smith v. Grimm,* 534 F.2d 1346, 1351 (C.A. 9, 1976), cert. den. 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). These claims have precisely that effect, particularly where there is no allegation or proof that any of Defendants took any action beyond the scope of their authority. They thus qualify for absolute immunity as to common law torts and statutory claims under *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); *Sportique Fashions,* supra, at 305–306; as the import of these claims would only fall upon the United States. *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939); *Commonwealth of Mass. v. U. S. Veteran's Administration,* 541 F.2d 119 (C.A. 1, 1976).

■ It is elementary that the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* constitutes an express, but limited waiver of sovereign immunity. Although negligent actions of government agents constituting a common law tort may be sued upon,

intentional torts are specifically excluded from this waiver. 28 U.S.C. § 2680(a), (h). See *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Claims against the Government based upon the concept of nuisance however, are included. *In Re: Silver Bridge Disaster Litigation,* 381 F.Supp. 931, 967 (S.D.W.Va., 1974). But the statute specifically requires an initial presentation of the claim to the appropriate federal agency and a final denial by that agency as a prerequisite to suit. 28 U.S.C. § 2675. This requirement is jurisdictional and cannot be waived. *Bialowas v. United States,* 443 F.2d 1047, 1049 (C.A. 3, 1971); *Collazo v. United States,* 372 F.Supp. 61 (D.P.R.1973). Plaintiffs have made no allegation nor presented any evidence to show compliance with this prerequisite.

■ The consequence of this situation is that the nuisance claims of Plaintiffs Romero Barceló, et al, Zenón et al and Medina et al, to the extent they may be interpreted as seeking damages, and the intentional and/or negligent conduct counts of Plaintiffs Medina et al's complaint, must be dismissed for lack of jurisdiction.

#### (3) *Plaintiffs Medina et al "taking" claims*

Plaintiffs Medina et al claim that they have been deprived of their property without just compensation when agents of the United States purchased a large number of private tracts in Vieques in "about 1941", which tracts are now part of the lands used by Defendant Navy. Here again we see that the real party is the United States and not the named individual Defendants.

With the exception of one Plaintiff, Angel Ventura, none of the other Plaintiffs have any standing to sue as they do not even allege to have been "deprived" property owners.[39] In any event, these claims are subject to the provisions of the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491, under which the Plaintiffs would have to sue. *Dow v.*

---

**39.** Class certification "of all those persons who, at the time of the Navy occupation of the Island of Vieques, in or around 1941, and thereafter, onwed (sic) property, and were deprived

of that property due to illegal actions of the United States Navy", was never granted. See *Romero Barceló v. Brown,* 78 F.R.D. 531, 533 (D.P.R., 1978).

*United States,* 357 U.S. 17, 21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).

The statute of limitations under this legislation is six years measured from the time when the cause of action first accrues against the Government. 28 U.S.C. § 2501. *Camacho v. United States,* 494 F.2d 1363, 204 Ct.Cl. 248 (1974); *Castro v. United States,* 500 F.2d 436, 205 Ct.Cl. 534 (1974). The time of taking is the date when the United States first enters into possession or files a declaration of taking, whichever is earlier. *Dow v. United States,* supra. Thus the time for filing a suit against United States would have expired in "about 1947", and a suit filed in 1978, as in the present case, is absolutely time barred. See *Camacho v. United States,* supra.

B. *The Federal Water Pollution Control Act*

Plaintiffs' claims under the Federal Water Pollution Control Act (33 U.S.C. §§ 1251–1376, as amended), referred to in this Section as the "Act", fall into two categories: (1) that Defendant Navy is required to obtain a National Pollution Discharge Elimination System (NPDES) permit for its discharge of sewage at Camp García and for the alleged discharge of ordnance from ships and planes which fall into the sea surrounding Vieques; (2) that the Defendant Navy is violating various Puerto Rican laws incorporated by reference into this Act (see 33 U.S.C. § 1323).

The uncontroverted evidence presented, including the testimony of the President of Plaintiff Environmental Quality Board, clearly establishes that Defendant Navy no longer discharges treated sewage effluent

from its plant at Camp García into the waters surrounding Vieques.[40] This operation has been converted to a land discharge, for which no permit is required under the Act.

As to the discharge of sewage by Defendant Navy's vessels into the surrounding sea, although there is no direct evidence presented of this taking place, the nature of Defendant Navy's operations make this a distinct possibility. The evidence is however, that with the exception of landing barges, these vessels operate beyond the three-mile limit, which is the maximum geographical coverage of the Act. 33 U.S.C. § 1362(7), (8) and (12). Furthermore, the Secretary of Defense has exempted these vessels from marine sanitation requirements pursuant to authority conferred by the Act. 33 U.S.C. § 1322(d).[41]

It is our opinion that the majority of the ordnance that falls into the waters surrounding Vieques does so by chance, although it appears that this may happen with some frequency in the waters in the immediate vicinity of Bahía Icacos and Bahía Salinas del Sur in the AIA/CAS/NGFS zones. Furthermore, as previously stated, a water target exists east of Punta Este which lies within the "territorial seas." 33 U.S.C. § 1362(8).

We must decide whether these accidental bombings of the navigable waters, and the occasional intentional bombing of the water target, require that Defendant Navy obtain a NPDES permit.

The conduct that requires an NPDES permit is "the *discharge* [or runoffs] of any pollutants" (emphasis added), 33 U.S.C. § 1311(a), § 1323(a). The term "discharge of any pollutant" means:

---

40. In contrast we should note that the Municipality of Vieques is one of 25 coastal municipalities in Puerto Rico that still discharge municipal wastes directly into the coastal zone, and is considered by Plaintiff Environmental Quality Board to "be a major source of pollution." (See *Exhibit CRB 400A,* page 95). These wastes reach coastal waters "relatively undiluted and without having been completely broken down biologically."

41. The Secretary has promulgated regulations which exempt these vessels from the provi-

sions for marine sanitation until April, 1981 (Department of Defense Directive Number 6050.4, April 28, 1976; see also: 40 C.F.R. 140.3(b). The regulations also exempt vessels totally, ". . . while conducting or participating in military operations and exercises [including training and readiness exercises and operations], within the navigable waters of the United States . . ." Department of Defense Directive Number 6050.4, April 28, 1976, part VIII(B)(2).

**664**

". . . (A) any addition of any *pollutant* to navigable waters from any *point source*.

(B) any addition of any *pollutant* to the waters of the contiguous zone or the ocean from any *point source* other than a vessel or other floating craft." (Emphasis added). 33 U.S.C. § 1362(12).

"Pollutant" is defined as:

". . . dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage *sludge, munitions,* chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water. . . ."

"Point source" in turn is defined as:

"*any* discernible, confined and discrete *conveyance,* including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, *from which pollutants are or may be discharged.* . . ." (Emphasis supplied) 33 U.S.C. § 1362(14).

■ It would be a strained construction of unambiguous language for the Court to interpret that the release or firing of ordnance from aircraft into the navigable waters of Vieques is not ". . . any addition of any pollutant . . . from any point source . . .", particularly in view of the broad rather than narrow interpretation given to this type of statute, *United States v. Standard Oil Co.,* 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); *United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); *Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617, 625 (C.A. 8, 1979); *United States v. Hamel,* 551 F.2d 107, 112 (C.A. 6, 1977); *United States v. Ashland Oil and Transportation Co.,* 504 F.2d 1317, 1328–1329 (C.A. 6, 1974). We are forced to so conclude notwithstanding the fact that the agency charged with administration of this Act, the Environmental Protection Agency, does not appear to have any regulation which provides for the issuance of a NPDES permit under circumstances such as herein presented, and further notwithstanding that we find that no credible evidence was presented to the Court to the effect that any of the materials deposited in the waters surrounding Vieques as a result of the aforementioned activities has had any measurable deleterious effects on the environment, or on the quality of the surrounding waters, from a scientific vis-à-vis legal standpoint. Nevertheless, we hold that as the Act now reads, Defendant Navy is required to have an NPDES permit to cover the accidental or intentional release or firing of ordnance into the areas herein discussed. *Train v. Colorado Public Interest Group,* 426 U.S. 1, 7, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *E.P.A. v. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

The second aspect of this issue is called into play by the provisions of 33 U.S.C. § 1323(a), which states:

"Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and *to the same extent as any nongovernmental entity* including the payment of reasonable service charges. . . ." (Emphasis added).

It is the contention of Plaintiffs that accidental and intentional ordnance dropping into the water areas previously indicated violates various Puerto Rican legislation, namely the Water Pollution Control Act (24 L.P.R.A. § 591 et seq.) the Public Policy Environmental Act (12 L.P.R.A. § 1121, et seq.) and the Water Pollution Control Regulation, promulgated thereunder.

The Public Policy Environmental Act, supra, is a statute which, as the title implies, generally sets out the Commonwealth's environmental posture and establishes the Environmental Quality Board to administer it. There is little of a specific nature in this statute on which we can hang our legal hat for purposes of the present issue.

It is in the Water Pollution Control Act, supra, that we find a specific relevant prohibition (24 L.P.R.A. § 595):

"It shall be unlawful for any person, directly or indirectly, to throw, discharge, pour, or dump, or permit to be thrown, discharged, poured or dumped into the waters, any organic or inorganic matter capable of polluting or of leading *to the pollution* of said waters in such manner as to place them out of the *minimum standards of purity* that the [Environmental Quality Board][42] may establish under section 599 of this title." (Emphasis supplied).

That statute defines "pollution" as follows: (24 L.P.R.A. § 591(i):

" 'To pollute', with reference to *waters*, means *making them in any way noxious to human health, or to that of animals, vegetables or fish, or rendering them ill-smelling or impure*, all *according to the permissible standards of purity or impurity* heretofore or hereinafter established as provided herein. 'Pollution' has this same meaning." (Emphasis supplied).

"Discharge" is defined as (24 L.P.R.A. § 591(j)):

". . . [T]he terminal of a sewer system, large or small, collective or individual, or of a discharge of industrial refuse or any other kind of refuse, where it emerges to be dumped into the waters."

This language, together with that statute's definition of "sewage",[43] "industrial waste"[44] and "other[s][45] kinds of refuse leads us to conclude that the prohibited acts under the Puerto Rican legislation are narrower in scope than those under the "Act."

To begin with, upon reading this statute we are left with the clear impression that it is only meant to cover normal endeavors of human activity producing sewage and industrial water through pipes and similar devices, and not military operations of the type here in question.[46] Apart from that however, the activity has to either make the water noxious to humans, animals, etc. or violate specific standards of water purity.

We have already stated that no credible evidence was adduced establishing that the activities of Defendant Navy have made the *water* noxious. Thus assuming it was the intention of the Puerto Rican Legislature to apply this statute to the naval operations of the Defendant Navy in Vieques, we must look to the regulations to determine whether a standard of purity established thereunder has been violated.

---

**42.** 12 L.P.R.A. § 1132(b).

**43.** *"Sewage, sewer water,* mean human and animal wastes, intestinal and others, dragged by water flowing from houses, residences, buildings, industrial establishments and other places, whether alone or mingled with surface or land waters. The mingling of industrial or other wastes with sewage or sewer waters shall be considered included under this term." (Emphasis in the original).

**44.** *"Industrial waste* is any liquid, gaseous, or solid refuse, or a combination of all, resulting from any industrial, manufacturing, commercial or business process, or from the processing of any raw material or natural wealth." (Emphasis in the original).

**45.** *"Others,* in connection with wastes, include garbage, residues, rotten wood, sawdust, filings, lime, ashes, offals, oil, dyes, acids, chemical substances and any other substance that may pollute or cause the pollution of waters." (Emphasis in the original).

**46.** This is reinforced by the definition of "harmful substance" and "spillage" contained in the Public Policy Environmental Act (12 L.P.R.A. § 1141(c) and (d):

" 'Harmful substance'—Those substances which by their nature may, in the event of spillage, cause damage to the environment, including, but without being limited to, substances such as petroleum and its derivatives." "Spillage"—Discharge, emission or expelling, whether accidental or intentional, of harmful substances from any kind of ship through pipelines or by any other means, into high seas or other bodies of water in Puerto Rico."

Plaintiffs rely on the applicability of the "Water Quality Standards Regulations" of Plaintiff Environmental Quality Board.[47] This regulation is intended to promulgate water quality standards for the coastal and surface waters of Puerto Rico, (Art. 3), and prohibits the pollution[48] of these waters (Art. 4.1.1) or the discharge of any water pollutant (Art. 4.1.2).

The water quality standards are the following:

"2.1 *General* water quality standards. All waters shall meet generally accepted aesthetic qualifications and shall be capable of supporting diversified aquatic life. These waters shall, except as specifically noted, meet the following quality standards:

2.1.1 Solids and other matter. The waters of Puerto Rico shall not contain materials attributable to *discharges* that will settle to form objectionable deposits. Nor will they contain floating debris, scum, oil and other floating materials attributable to *discharges* in amounts sufficient to be unsightly or deleterious.

2.1.2 Color, odor, taste or turbidity. The waters of Puerto Rico shall be free from color, odor, taste or turbidates attributable to *discharges* in such a degree as to create a nuisance.

2.1.3 Substances in toxic concentrations thereof

The waters of Puerto Rico shall not contain substances in concentrations or combinations which are toxic or which produce undesirable physiological responses in human, fish or other animal life, and plants.

A. *Specific standards* for some substances:

i) Coastal waters

The maximum allowable concentrations of certain substances in the receiving coastal waters shall be the following:

| Substance | Limit (mg/1) |
| --- | --- |
| Arsenic (As) | 0.15 |
| Barium (Ba) | 1.0 |
| Boron (B) | 4.8 |
| Cadmium (Cd) | 0.005 |
| Carbon (Chloroform extract) | 28.0 |
| Chromium (hexavalent (Cr.) | 0.05 |
| Chromium (trivalent (Cr.) | 0.30 |
| Copper (Cu) | 0.05 |
| Cyanide (CN) | 0.01 |
| Detergents (Methylene Blue (Active Substances) | 0.5 |
| Fluorides (F) | 1.3 |
| Iron (Fe) | 0.200 |
| Lead (Pb) | 0.015 |
| Manganese (Mn) | 0.100 |
| Mercury (Hg) | 0.001 |
| Nitrogen ($NO_3$ $NO_2$ $NH_3$) | 5.0 |
| Phenols | .010 |
| Selenium (Se) | 0.01 |
| Silver (Ag) | 0.001 |
| Sulfate ($SO_4$) | 2800. |
| Uranil ($UO_2$) | 0.500 |
| Zinc (Zn) | 0.050." |

(Emphasis supplied)

■ Defendant Navy makes much ado about the unconstitutional vagueness of these provisions. See *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed.

**47.** According to this document, the regulation was filed in the Department of State of the Commonwealth of Puerto Rico on January 4, 1974, and later amended in May, 1974 and October, 1976. The Political Code of Puerto Rico provides (3 L.P.R.A. § 1046) that regulations filed with the Department be published in two newspapers of general circulation and in the "Commonwealth of Puerto Rico Register" ("Boletin del Estado Libre Asociado de Puerto Rico"). It does not appear that this regulation or the amendments were ever published in the Register. The Department has discontinued publishing the Register since 1972 for alleged lack of funds. The prior regulation is found at 24 R & R 598–1 et seq., and is substantially different in parts from the regulation assumed to be in effect by all parties.

**48.** The definition of "pollution" in the regulation is slightly different from that in the statute:

"Pollute (to), Pollution. Altering the natural characteristics of a body of water so as to make it in any way harmful or noxious to human health, or to that of animals, or plants, or rendering it ill-smelling or impure or altering adversely its physical, chemical, microbiological or radioactive condition, in such a way as to interfere with the standards of purity established by this Regulation." Art. 1.

888 (1939); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); but see: *Cerame Vivas v. Secretary of Health*, 99 P.R.R. 44 (1976). However, this is an issue we need not decide as this regulation is clearly inapplicable to Defendant Navy's operations presently at issue.

The key word in the quality standards reproduced above is "discharges." The regulation defines this term as follows:

" 'Discharge (to), Discharge'—The outflow of *wastewater* from any domestic, commercial, industrial, agricultural or any other source into receiving waters." (Emphasis supplied). Art. I.

When we seek the definition of "wastewater" in the regulation we are referred to the definition of "municipal wastes", which states:

"Water carrying human and animal wastes from homes, buildings, industrial establishments and other places alone or in combination with industrial wastes." (Art. I.)

We see no plausible way of interpreting the accidental or intentional bombing or sheltering of the coastal waters as falling within the proscribing language of the regulation. This of course, is in keeping with our prior interpretation of the language of the Statute which authorizes this regulation.

Furthermore, the record is barren of any credible evidence which would support a finding that Defendant Navy has conducted any activity violative of the specific standards of Article 2.1.3 Ai) of this Regulation or that the waters in question do not "meet generally accepted aesthetic qualifications" or are not "capable of supporting diversified aquatic life." In fact, if anything, these waters are as aesthetically acceptable as any to be found anywhere, and Plaintiffs' witnesses unanimously testified as to their being the best fishing grounds in Vieques.

C. *The Marine Protection, Research and Sanctuaries Act*

 Plaintiffs' claim to the effect that Defendant Navy's activities violate the Marine Protection, Research and Sanctuaries Act, also known as the "Ocean Dumping Act", and referred to in this section as the "Act", 33 U.S.C. § 1401 *et seq.*, are clearly without merit. It is Plaintiffs' contention that Defendant Navy's discharge of ordnance in the waters off Vieques as well as related activities during the course of military operations, constitute "dumping" which requires a permit from the Environmental Protection Agency, a permit which Defendant Navy lacks.

It cannot be disputed but that the complained of activities are incidental to military training exercises and that the purpose of Defendant Navy's activities are said exercises rather than the disposal of waste.

The definition of "dumping" contained in the Act excludes ". . . the intentional placement of any device in ocean waters or on or in the submerged land beneath such waters, for a purpose other than disposal, when . . . such placement . . . occurs pursuant to an authorized Federal . . . program." 33 U.S.C. § 1402(f). This language, together with the legislative history of the Act, leave no doubt but that Congress intended to prohibit *purposeful disposal of waste*. See 1972 U.S.Code Cong. & Admin.News, pp. 4234 *et seq.* The report of EPA Administrator William D. Ruckelshaus specifically states:

"Special note should also be made of the fact that 'dumping' as defined in subsection 3(f) would not include an activity which has as its primary purpose a result other than 'a disposition of material' but which involves the incidental depositing of some debris or other material in the relevant waters. *For example, material from missiles and debris from gun projectiles and bombs ultimately come to rest in the protected waters. Such activities are not covered by this Act.*" Supra, p. 4255–6. (Emphasis supplied).

D. *Allegations under the Resource Conservation and Recovery Act*

The allegations of Plaintiffs pursuant to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.* herein-

after referred to in this Section as the "Act" are equally without substance. A reading of this statute as well as its legislative history establishes beyond any question that Congress' intended targets were the evils brought about by "solid wastes" and "hazardous wastes" as *therein* defined.[49] "Solid Waste" is defined as:

". . . [A]ny garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other *discarded*

**49.** The Congressional findings contained in 42 U.S.C. § 6901 are particularly illustrative of this point:

"(a) *Solid waste.* The Congress finds with respect to solid waste—

(1) that the continuing technological progress and improvement in methods of manufacture, packaging, and marketing of consumer products has resulted in an ever-mounting increase, and in a change in the characteristics, of the mass material discarded by the purchaser of such products;

(2) that the economic and population growth of our Nation, and the improvements in the standard of living enjoyed by our population, have required increased industrial production to meet our needs, and have made necessary the demolition of old buildings, the construction of new buildings, and the provisions of highways and other avenues of transportation, which, together with related industrial, commercial, and agricultural operations, have resulted in a rising tide of scrap, discarded, and waste materials;

(3) that the continuing concentration of our population in expanding metropolitan and other urban areas has presented these communities with serious financial, management, intergovernmental, and technical problems in the disposal of solid wastes resulting from the industrial, commercial, domestic, and other activities carried on in such areas;

(4) that while the collection and disposal of solid waste should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter national in scope and in concern and necessitate Federal action through financial and technical assistance and leadership in the development, demonstration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid-waste disposal practices.

(b) *Environment and health.* The Congress finds with respect to the environment and health, that—

(1) although land is too valuable a national resource to be needlessly polluted by discarded materials, most solid waste is disposed of on land in open dumps and sanitary landfills;

(2) disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment;

(3) as a result of the Clean Air Act, the Water Pollution Control Act, and other Federal and State laws respecting public health and the environment, greater amounts of solid waste (in the form of sludge and other pollution treatment residues) have been created. Similarly, inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health;

(4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land;

(5) hazardous waste presents, in addition to the problems associated with non-hazardous solid waste, special dangers to health and requires a greater degree of regulation than does non-hazardous solid waste; and

(6) alternatives to existing methods of land disposal must be developed since many of the cities in the United States will be running out of suitable solid waste disposal sites within five years unless immediate action is taken;

(c) *Materials.* The Congress finds with respect to materials, that—

(1) millions of tons of recoverable material which could be used are needlessly burned each year;

(2) methods are available to separate usable materials from solid waste; and

(3) the recovery and conservation of such materials can reduce the dependence of the United States on foreign resources and reduce the deficit in its balance of payments.

(d) *Energy.* The Congress finds with respect to energy, that—

(1) Solid waste represents a potential source of solid fuel, oil, or gas that can be converted into energy;

(2) the need exists to develop alternative energy sources for public and private consumption in order to reduce our dependence on such sources as petroleum products, natural gas, nuclear and hydroelectric generation; and

(3) technology exists to produce usable energy from solid waste."

See also 1976 U.S.Code Cong. and Admin. News, pp. 6238 *et seq.*

*material,* including solid, liquid, semisolid, or contained gaseous material *resulting from industrial, commercial, mining and agricultural operations, and from community activities. . . .* " (Emphasis supplied). See 42 U.S.C. § 6903(27).

With one exception which will be presently discussed, it is obvious that Defendant Navy's military activities, although causing the incidental depositing of debris are not the *discarding of material nor are they the* result of an industrial, commercial, mining or agricultural operation.

"Hazardous waste" is in turn defined as:

"[*A*] *solid waste, or combination of solid wastes,* which because of its quantity, concentration or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." (Emphasis supplied). See 42 U.S.C. § 6903(5).

Even assuming that Plaintiffs have otherwise met the substantial burden placed upon them by sub-paragraphs (A) and (B) of this definition, a fact which is far from certain, the scope of this definition in referring to "solid waste", a term of art under this Act, excludes *military* hazardous wastes from its coverage.

Plaintiffs next rely on the "Regulation for the Control of Solid Waste" promulgated by Plaintiff Environmental Quality Board.[50] Plaintiffs allege that this regulation is applicable to Defendant Navy's activities by virtue of 42 U.S.C. § 6961, which states:

"Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any *solid waste management facility* or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal of *solid waste,* or *hazardous waste* shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief) respecting control and abatement of *solid waste* or *hazardous waste* disposal in the same manner, and to the same extent, as any person is subject to such requirements, . . ." (emphasis supplied).

The military activities of Defendant Navy, with one exception, fall outside of the scope of this delegation. Within the Act's definition of the term "solid waste management facility" we find that it includes "any facility for the treatment of solid wastes, including hazardous wastes, whether such facility is associated with facilities generating such wastes or otherwise." 42 U.S.C. § 6903(29). Considering this definition together with the definition of "solid waste", which as previously indicated, includes "discarded material . . resulting from . . . *community activities* . . ." (emphasis supplied, 42 U.S.C. § 6903(27), it becomes apparent that the Commonwealth's regulation is applicable to a single trench landfill operated by the Marines in Camp García for the disposal of food waste and packaging material. As to this, the evidence presented during the trial shows that on October 16, 1978, Defendant Navy applied to the Environmental Quality Board for a solid waste facility operating permit.

### E. *The Rivers and Harbors Act*

Plaintiffs seek injunctive relief alleging that Defendant Navy has violated the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 *et seq.,* hereinafter called the "Act" in this Section. More specifically, Plaintiffs claim that Defendant Navy has without a permit from the Corps of Engineers thrown, discharged or deposited refuse ma-

**50.** See footnote 47.

terial in the navigable waters of the United States in violation of Section 13 of the Act (33 U.S.C. § 407), and also without a permit, has sunk vessels and other craft in the vicinity of Vieques in violation of Section 15 of the Act (33 U.S.C. § 409).

■ The short answer to these contentions is that Plaintiffs lack standing to sue for these alleged violations.

In differentiation to other statutes involved in this case,[51] the "Act" not only fails to provide for a private right of action to enforce its provisions, but in fact preempts the field in favor of *public* enforcement. Thus 33 U.S.C. § 413 clearly and expressly mandates that:

"The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of Sections 401, 403, 404, 406, *407*, 408, *409*, 411, 549, 686 and 687 of this title; . . ." (Emphasis supplied).

Plaintiffs rely on *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), for the proposition that in addition to the criminal sanctions of this penal statute, they as private parties are allowed to seek injunctive relief for its alleged violation. But this case far from supporting this proposition concludes that it is the *United States* that has the right to injunctive relief in aid of protecting a public interest expressed in a statute containing criminal penalties for its violation. The Court there said (389 U.S. 201–202, 88 S.Ct. 385–386, citations omitted):

"Article I, § 8, of the Constitution grants to Congress the power to regulate commerce. For the exercise of this power, the navigable water of the United States are to be deemed the 'public property of the nation, and subject to all the

requisite legislation by Congress.' The Federal Government is charged with ensuring that navigable waterways, like any other routes of commerce over which it has assumed control, remain free of obstruction. The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States, was obviously *intended to prevent obstructions in the Nation's waterways.* Despite some difficulties with the wording of the Act, we have consistently found its coverage to be broad. And *we have found that a principal beneficiary of the Act, if not the principal beneficiary, is the Government itself.*

"Our decisions have established, too, the general rule that the *United States* may sue to protect its interests. This rule is not necessarily inapplicable when the particular government interest sought to be protected is expressed in a statute carrying criminal penalties for its violation. Our decisions in cases involving civil actions of private parties based on the violation of a penal statute so indicate. In those cases we concluded that criminal liability was inadequate to insure the full effectiveness of the statute which Congress had intended. *Because the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall, we held that civil actions were proper.* That conclusion was in accordance with a general rule of the law of torts. We see no reason to distinguish the Government, and to deprive the *United States* of the benefit of that rule.

"The inadequacy of the criminal penalties explicitly provided by § 16 of the

---

51. See e. g.: Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365; Section 11 of the Endangered Species Act, 16 U.S.C. § 1540(g)(1); Section 7002 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972; and Section 304 of the Clean Air Act, 42 U.S.C. § 7604. Recently the Supreme Court has stated: "When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course

is for it to specify as much when it creates those rights." *Cannon v. University of Chicago*, —— U.S. ——, at p. ——, 99 S.Ct. 1946 at p. 1967, 60 L.Ed.2d 560 (1979). Exceptions to Congress' failure to specify a private cause of action are both "limited" and "typical." Id. Here the language of Section 413 is indicative of legislative intent for public rather than private enforcement.

Rivers and Harbors Act is beyond dispute. That section contains only meager monetary penalties. In many cases, as here, the combination of these fines and the Government's *in rem* rights would not serve to reimburse the *United States* for removal expenses. It is true that § 16 also provides for prison terms, but this punishment is hardly a satisfactory remedy for the pecuniary injury which the negligent ship owner may inflict upon *the sovereign*." (Emphasis supplied).

It is clear that this case does not support Plaintiffs' standing under the Act to seek *private* injunctive relief. See *Cort v. Ash*, 422 U.S. 66, fn. 11, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1974); *Cannon v. University of Chicago*, supra at fn. 13 and (J. Powell, dissenting) fn. 3.

We decline the invitation to follow *Natural Resources Defense Council Inc. v. Grant*, 355 F.Supp. 280 (E.D.N.C., 1973) and *People of State of Illinois ex rel. Scott v. Hoffman*, 425 F.Supp. 71 (S.D.Ill., 1977), as in our opinion they run contrary to the controlling language of 33 U.S.C. § 413 and to the greater weight of authority. The Second, Third, Fourth, Fifth, and Seventh Circuits have all expressed themselves as finding no private causes of action under different sections of the Rivers and Harbors Act, see: *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81 (C.A. 2, 1972); *Red Star Towing & Transportation Co. v. Department of Transportation*, 423 F.2d 104, 105 (C.A. 3, 1970); *Hughes v. Ranger Fuel Corp.*, 467 F.2d 6, 8 n. 1 (C.A. 4, 1972);[52] *Guthrie v. Alabama By Products*, 456 F.2d 1294 (C.A. 5, 1972) cert. den. 410 U.S. 946, 93 S.Ct. 1352, 35 L.Ed.2d 613 (1973);[53] *Jacklovich v. Interlake, Inc.*, 458 F.2d 923 (C.A. 7, 1972). Besides *Grant*, supra, and

*Hoffman*, supra, only the Ninth Circuit in *Riggle v. State of California*, 577 F.2d 579, 582–583 (C.A. 9, 1978),[54] and in two lower court decisions, *Sierra Club v. Morton*, 400 F.Supp. 610, 622–623 (N.D.Cal.1975); *Sierra Club v. Leslie Salt Co.*, 354 F.Supp. 1099, 1104–05 (N.D.Cal.1972), have recognized private causes of action under this "Act." All other lower court case law is decidedly against recognizing such a right. *Township of Long Beach v. City of New York*, 445 F.Supp. 1203 (D.N.J.1978); *Loveladies Property Owners Ass'n v. Raab*, 430 F.Supp. 276, 281 (D.N.J.1975) aff'd unreported decision, 547 F.2d 1162 (C.A. 3 1976) cert. den. 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977); *Parsell v. Shell Oil Co.*, 421 F.Supp. 1275 (D.Conn., 1976); *Burgess v. M/V Tamano*, 373 F.Supp. 839, 845 (D.Me., 1974); *Gerbing v. I.T.T. Rayonier Incorporated*, 332 F.Supp. 309 (M.D.Fla.1971); *Hooper v. United States*, 331 F.Supp. 1056, 1058 (D.Conn.1971); *Bass Anglers Sportsman's Society v. Scholze Tannery Inc.*, 329 F.Supp. 339 (E.D.Tenn.1971); *United States ex rel. Mattson v. Northwest Paper Company*, 327 F.Supp. 87 (D.Minn.1971); *Enquist v. Quaker Oats Company*, 327 F.Supp. 347 (D.Neb. 1971); *Bass Anglers Sportsman's Society v. Plywood Champion Papers, Inc.*, 324 F.Supp. 302 (S.D.Tex.1971); *Bass Anglers Sportsman Society v. United States Steel Corp.*, 324 F.Supp. 412 (N.D., M. D., and S. D. Ala.1971) aff'd. 447 F.2d 1304 (C.A. 5, 1971); see also: *H. Christiansen & Sons, Inc. v. City of Duluth*, 154 F.2d 205 (C.A. 8, 1946). Contra see: *Potomac River Association, Inc. v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344 (D.Md. 1975).

While we hold that sounder law dictates a finding that no private cause of action is

---

**52.** The Fourth Circuit may have implicitly recognized such a right by affirming three lower court decisions without discussion on this point, see: *Rucker v. Willis*, 358 F.Supp. 425 (E.D.N.C.1973) aff'd 484 F.2d 158 (1973); *River v. Richmond Metropolitan Authority*, 359 F.Supp. 611 (E.D.Va.1972) aff'd. 481 F.2d 1280 (1973); *Lauritzen v. Cheasapeake Bay Bridge and Tunnel District*, 259 F.Supp. 633 (E.D.Va. 1966) aff'd 404 F.2d 1001 (1968).

**53.** But cf.: *Neches Canals Co. v. Miller & Vidor Lumber Co.*, 24 F.2d 763 (C.A. 5, 1928) with *Intercoastal Transportation, Inc. v. Decatur County, Georgia*, 482 F.2d 361 fn. 14 (C.A. 5, 1973).

**54.** Cf. also: *Alameda Conservation Association v. California*, 437 F.2d 1087 (C.A. 9, 1971), cert. den. 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971).

created by the Rivers and Harbors Act, as is clear from the above citations, we are not unmindful of the division of authority on this point. As mentioned Plaintiffs specifically allege violations under Sections 13 and 15 of this Act, 33 U.S.C. §§ 407, 409. Section 13 of this Act, also commonly known as the "Refuse Act" generally prohibits the "discharge, or deposit, [of] . . ., any refuse matter of any kind or description . . ., into any navigable water of the United States" without a permit from the Secretary of the Army. It may be true that Defendant Navy's release of ordnance in the navigable waters surrounding Vieques could constitute "refuse matter" under Section 407. *United States v. Standard Oil*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). But even so assuming any relief that we could enter for this violation would be only superfluous and cumulative. We have hereinbefore found that under the Federal Water Pollution Control Act the Defendant Navy must secure a permit for the release or firing of ordnance into the surrounding waters. An NPDES permit under the pollution act is the same permit required under Section 407 of the Rivers and Harbors Act, see: 33 U.S.C. § 1342(a)(4), (5). Relief entered under the pollution act and any relief that might be entered under Section 407 would necessarily be identical.

Plaintiffs also argue that Defendant Navy is in violation of Section 409 of this Act. Said Section makes it unlawful

". . . to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily, or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; . . ."

Plaintiffs' contention in this regard centers on the sinking of the U.S.S. Killan, a landing barge, in the waters of Vieques. See n. 29, supra. The short answer to these allegations is that the record contains no evidence establishing any obstruction to navigation or that any other vessels plying these waters are endangered by this. In fact the state of this vessel is such as may be classified as "broken up", cf. 33 U.S.C. § 414, and constitutes no safety hazard. Moreover, the environmental effects of this sinking, if any, are essentially minimal.

F. *Claims under the Federal Clean Air Act*

Plaintiffs Romero Barceló, et al., Medina, et al., and Zenón, et al., claim that Defendant Navy's activities violate the Federal Clean Air Act, 42 U.S.C. § 7401 *et seq.* (hereinafter called the "Act" in this Section) and Executive Order 11752. It is alleged that this statute requires that the departments of the executive branch of the Federal government comply with local requirements regulating the control and abatement of air pollution, but that Defendant Navy's activities, particularly the use of ordnance and the bulldozing and maintenance of unpaved roads, violate the "Regulation for the Control of Atmospheric Pollution" promulgated by the Plaintiff Environmental Quality Board, especially as related to so-called "fugitive dust."

It cannot be seriously questioned but that, under appropriate circumstances, the Act requires the Federal Government to comply with State substantive and procedural requirements related to air pollution. 42 U.S.C. § 7418(a) (West Supp.1977).[55]

---

**55.** This provision states:
"Each department, agency and instrumentality of the executive . . . branch[es] of the Federal Government (1) having jurisdiction over any property or facility or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, and each officer, agent or employee thereof, shall be subject to, and comply with, all . . . State, interstate, and local requirements, ad-

ministrative authority, and process and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Feder-

*People of State of Cal., etc. v. Dept. of Navy*, 431 F.Supp. 1271 (N.D.Cal.1977). The issue is whether the matters claimed herein are such an appropriate circumstance.

The regulation in question [56] states that ". . . [n]o person shall cause or permit air pollution as defined in Article 1." Art. 2.1.1. "Air pollution" is defined as:

"The presence in the outdoor atmosphere of one or more *air pollutants in such quantities and duration* as is or could be injurious to human health or welfare, animal or plant life, or property, or which interferes with the enjoyment of life or property." (Emphasis supplied). Art. 1.

"Air pollutant" includes:

"Dust, fumes, mist, smoke, other particulate matter, vapor, gas odorous substances, or any combination thereof, but not including uncombined water vapor." Art. 1.

As to "fugitive dust" the regulation states that it is:

"Solid airbone (sic) particulate matter from any source other than through a stack."

Article 5.2.1, which specifically deals with fugitive dust, states:

"No person shall cause or permit any materials to be handled, transported or stored; or a building, its appurtenances, or a road to be used, constructed, altered, repaired or demolished without taking reasonable precautions to prevent particulate matter from becoming airborne. . . ."

Another section of this regulation requires that:

"No person shall cause *or permit the discharge of visible emissions of fugitive dust beyond the lot line of the property* on which the emissions originate." (Art. 5.2.2).

In our opinion nothing but sheer speculation would support a finding that Defendant Navy's emissions of "fugitive dust" are "in such quantities and duration as is or could be injurious to human health or welfare, animal or plant life or property." Although Defendant Navy's activities undoubtedly produce "dust, fumes . . . [and] smoke . . ." in what we consider to be relatively limited amounts [57] and of short duration, Plaintiffs fall considerably short of their burden in having failed to show in any convincing fashion any deleterious effect to humans, or otherwise, of the "fugitive dust" caused by the objected activities of Defendant Navy, much less that there are "visible emissions . . . beyond the lot line of the property on which the emissions originate."

In fact the "hard" evidence is to the contrary. Although the Environmental Protection Agency inspected the Camp García facility on November 1977, and March 1978 for air pollution matters, no "fugitive dust" was noted as a problem in either report. Existing studies by Plaintiff Environmental Quality Board (EQB) show no violation of the federal standards for 24-hours maximum allowable concentration of particulate matter in either Isabel Segunda or Esperanza. A nineteen-day study in 1972 conducted by the EQB in Isabel Segunda, found the background level for particulate matter at 80 micrograms per cubic meter, far less than the allowable concentration, which is 150 microgram per cubic meter, or than the national secondary standard for 24-hour maximum allowable concentration, which is 150 micrograms per cubic meter. Furthermore, the measure-

---

al, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. No officer, agent, or employee of the United States shall be personally liable for any civil penalty for which he is not otherwise liable."

**56.** We are faced with a problem respecting this regulation similar to that discussed in Footnotes 47 and 49.

**57.** Based on observation by the Court of bombing runs, as well as photographs introduced in evidence.

ments of sulfur dioxide, nitrogen oxide, ozone, hydrocarbons and particulates did not show any violation of national ambient air quality standards in either Isabel Segunda or Esperanza. Another sampling conducted by the E.Q.B. at Esperanza throughout May 25-June 6, 1978, showed a average of 99 micrograms per cubic meter at Esperanza as compared to only 25.9 microgram per cubic meter at the impact area, again in neither case exceeding the 24-hour maximum allowable concentration.

 Of course, we have throughout this discussion been assuming that Plaintiffs are on sound footing procedurally, a situation which unfortunately for Plaintiffs, is not the case. Although for many sources of air polluting emissions the states are allowed to continue enforcing their own laws and regulations (42 U.S.C. § 7416),[58] a citizen's suit such as the present one under the provisions of 42 U.S.C. § 7604(a), must be based on the violations of a *specific* emission *standard or limitation*. *Citizens for Clean Air, Inc. v. Corps. of Engineers*, 356 F.Supp. 14 (S.D.N.Y.1973).

This section provides that:

"(a) . . . [A]ny person may commence a civil action on his own behalf—(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or *limitation* under this chapter or (B) an order issued by the Administrator or a State with respect to *such a standard or limitation* . . ." (Emphasis supplied).

 Under 42 U.S.C. § 7604(f) "emission standard or limitation" is defined as:

". . . (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive, or

(3) any condition or requirement of a permit . . . any condition or requirement . . . (relating to certain enforcement order) . . . any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, . . . (relating to fuel and fuel additives) . . . [and] (relating to visibility protection), any condition or requirement . . . (relating to ozone protection) or any requirement . . . (without regard to whether such requirement is expressed as an emission standard or otherwise).

This definition does not incorporate a local regulation such as the one here in question dealing with "fugitive dust" and which in fact contains no quantitative limitation. Therefore, no citizens suit lies under the Act for enforcement of the regulation in question. *Citizen for Clean Air, Inc. v. Corps of Engineers, U. S. Army*, supra.

### G. *The Noise Control Act claims*

It is the contention of Plaintiffs that Defendant Navy's military activities (shelling, bombing, artillery practice and aircraft and helicopter overflights) "generate noise [and shock waves] that unreasonably interfere[s] with the welfare of the residents on the island" in violation of the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, referred to as the "Act" in this section.

This Statute directs Federal agencies, "to the fullest extent consistent with their authority" to carry out the programs within their control in such a manner as to further the Act's noise abatement policies, namely, ". . . to promote an environment for all Americans free from noise that jeopardizes their health or welfare." See 42 U.S.C. §§ 4901, 4903(a). The Act requires that:

(1) any standard or limitation respecting emissions of air pollutants or
(2) any requirement respecting control or abatement of air pollution . . . .."

---

58. In its pertinent parts this section reads as follows:

"[N]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce

"Each department, agency or instrumentality of the executive, legislative, and judicial branches of the Federal Government—

(1) having jurisdiction over any property or facility, or

(2) engaged in any activity resulting, or which may result, in the emission of noise, shall comply with Federal, State, interstate and local *requirements respecting control and abatement of environmental noise* to the same extent that any person is subject to such requirements . . ." (See 42 U.S.C. § 4903(b)). (Emphasis supplied).

Executive Order 11752 (38 Fed.Reg. 34793, Dec. 17, 1973) in substance requires this same action from Federal agencies.

Plaintiffs' principal reliance for their contentions is placed on Puerto Rico's criminal nuisance statute, 33 L.P.R.A. § 1365, which states that:

"Anything which is injurious to health, or is . . . offensive to the senses, or is an obstruction of the free use of property so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons . . is a public nuisance."

For reasons that are not clear to us, Plaintiffs make no mention of Puerto Rico's civil nuisance law, found at 32 L.P.R.A. § 2761, which would seem to have more relevance than the cited criminal law. The language of this statute is somewhat similar to the penal law:

"Anything which is injurious to health, . . . or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action. Such action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well

as damages recovered; nothing herein provided shall apply to activities related to public worship in churches practiced by different religions; Provided, That the provisions herein established shall not be construed as a limitation of the powers of the Environmental Quality Board to promulgate regulations, as it is authorized by law."

In any event, in our opinion neither the penal or the civil nuisance statutes can be considered as establishing "requirements respecting control and abatement of environmental noise." This language of the Act together with the legislative history of 42 U.S.C. § 4903(b) contemplates compliance with *specific standards* existing or to be promulgated by the various jurisdictions. Thus Senate Report No. 92–1160 speaks in terms of "authority to establish and enforce *limits* on environmental noise" and the authority of the ". . . States and local governments . . . *to* . . . *reach or maintain levels* of environmental noise which they desire through (a) operational limits or regulations on products in use . . . ; (b) quantitative limits on environmental noise in a given area which may be enforced against any source within the area . . . (c) regulations limiting the environmental noise which may exist at the boundary of a construction site; (d) nuisance laws; or (e) other devices tailored to the needs of differing localities and land uses . . .." (Emphasis supplied, see 1972 U.S.Code Cong. and Admin.News pp. 4655, 4660).

Conversely, in interpreting the civil nuisance statute the Supreme Court of Puerto Rico held in *Arcelay v. Sánchez* 77 P.R.R. 782 (1955), that there are no fixed norms for making a determination of whether a nuisance exists but rather that the resolution of the problem must be decided on a case by case basis, the fundamental question being whether or not the use by the defendant of his property is reasonable, bearing in mind the right of the complainant to enjoy his own property.[59]

---

**59.** We need not decide whether these statutes run afoul of Defendant Navy's challenge on the basis of overbroadness and vagueness. *Cf. Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242,

Shortly before the end of the trial, Plaintiff Environmental Quality Board promulgated a "Regulation For The Prevention and Control of Noise Pollution", pursuant to authority conferred under the Public Policy Environmental Act of Puerto Rico (12 L.P.R.A. § 1121, *et seq.* at § 1131(12)). Although it contains specific noise standards this regulation did not come into effect until after the trial ended.[60]

Irrespective of the above discussion, even under the most liberal interpretation of the Puerto Rican nuisance statute or the quoted noise regulation, Plaintiffs have failed to establish facts attributable to Defendant Navy justifying a conclusion that it is generating noise and shock waves of such magnitude as to interfere with either the health or property of the civilian residents of Vieques. On this issue the Court not only received extensive expert and lay testimony, but conducted a site inspection during actual bombing of the range, for the specific purpose of perceiving subjective sound impressions. In this respect the Court was present on four different locations: the observation post at Cerro Matías, located approximately 2–3000 yards from the impact points), and three civilian sites, Colonia Lujan, (about 9 miles away) the town square at Isabel Segunda, (about 10 miles distant) and Barrio Santa María (approximately 8 miles distant). During these listening periods the Court was accompanied by experts of all the parties, who had suitable measuring and recording instruments.

Suffice it to say that even during the bombing runs while at the observation post at Cerro Matías, the aircraft-connected sound were "negligible", while this time same activity was at best "barely audible" at the Barrio Santa María location.

The sounds of the bombs landing can of course be clearly heard from the observation post. These varied from an instrument recorded 128 decibels (dB) sound, involving the dropping of one MK-82 (500 pounds) bomb, to a high of 137 dB from twenty MK-82 (500 pounds) bombs, which did cause shockwave-induced rattling in the observation post's windows.

The sounds of explosions were not discernible to the human ear from any of the three civilian locations. Although they could be recorded with the aid of instruments at Luján and Santa María, they were completely inaudible, even by instruments, from the central Plaza at Isabel Segunda.[61] At Luján, using the peak flat sound pressure level (peak flat SPL) scale,[62] with an

39 L.Ed.2d 605 (1974); *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

**60.** The regulation was filed with the Secretary of State on November 24, 1978. Pursuant to its own terms it became effective 30 days *after* said filing, i. e., after the trial ended. See Art. 7.4. See also footnote 47.

**61.** This was so even during the times when the nearby church is not blasting its message through its loud speakers, a "nuisance" excluded from coverage of the law by virtue of the proviso in 32 L.P.R.A. § 2761. Cf. *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974).

**62.** It has been customary to describe the magnitude of the sound of an explosion by the *peak sound pressure level* as received in a wide frequency band. The four elements are (1) *peak*, signifying the greatest instantaneous sound pressure that exists during a time period under consideration (2) *sound pressure*, which is the variation of atmospheric pressure about the steady atmospheric pressure; an important unit of sound pressure is the pascal (Pa), (3) *level*, which is a logarithm of a sound pressure ratio; the usual unit of level is the decibel (dB), and (4) *flat*, pertaining to a frequency range wide enough to include the significant frequency components of sound, over which the response of the measuring instrument does not change much with frequency; this range must be specified for each measuring instrument.

Although the above-contained definition of "peak" is simple, it leads to large numbers of measurements to describe the noise in the community. If only the peak sound pressure level in an hour were reported, information would be lost completely about the many different time patterns that could occur, which all have the same peak value. Therefore, it is customary to measure a certain average over one of several standardized time intervals. The averaging time frequency used in a sound level meter is called FAST: it causes the sound level meter to respond primarily to recent sounds (mostly within ⅛ second) almost as quickly as does the ear in judging the loudness of a sound. This measurement is called *fast sound level.*

ambient level [63] of between 83 to 93 dB, the events recorded between 91 and 99.6 dB. On this same location, using the Slow A sound pressure level (Slow A SPL) scale, with an ambient level of between 42 and 53 dB, the events recorded between 45.8 and 53 dB. At Santa María, using the peak flat SPL scale, with an ambient level of between 70 and 92 dB, the recorded events varied between 94.8 and 102.2 dB, but several of the events could not be picked up even with the instruments. On the Slow A SPL scale, with ambient levels of between 48 to 57 dB, none of the events could be heard. The events in question involved up to 8–500 pound bombs simultaneously dropped.

It is an established scientific fact that damage begins to occur to both people (eardrums) and houses (window breakage), at a peak flat SPL of 140 dB. Ground motion damage to structures can begin to occur at 3 millimeters vibrations per second. The above recordings, together with other matters to be discussed do not establish sound pressures or ground motion levels [64]

A standardized slower response is additionally available in the sound level meter; it is called SLOW. It likewise causes the sound level meter to respond primarily to recent sound (mostly within one second). This level is called *slow sound level.*

Noise in the community may vary widely within any given time span. To get a single number to represent all the noise in a longer time period, an average is taken (in a way peculiar to sound level meters) over a minute, hour, day or year. For *average sound level,* equal emphasis is given to all sound within the stated averaging period; whereas for peak, fast, or slow sound level, the emphasis is graduated to put much more emphasis on recently occurring sounds. A time-period average sound level is also called an equivalent continuous sound level.

Because people are annoyed more by sounds at night, a noise descriptor now widely recognized is the *day-night average sound level.* This is the 24-hour average sound level obtained for a given day after addition of ten decibels to sound levels that occur from midnight up to 7 A.M. and from 10 P.M. to midnight.

*Sound exposure level* is a recently developed measure of the total sound accumulated over a given time period or event. It is not an average. It is particularly appropriate for a discrete event like the explosion of a bomb, the passage of an aircraft or a clap of thunder. In contrast to average sound level which for a steady sound remains constant, the sound exposure level of a steady sound increases continuously with the passing of time.

The ear does not respond equally to sounds of any frequency; it is most sensitive to sounds of any frequency; it is most sensitive to sounds whose frequency are in the vicinity of 3,000 hertz (cycles per second) near the top of the playing range of a piano. To simulate this ear response, the sound level meter is given the *A-frequency weighting.* A standard sound level meter may contain still other frequency weightings, such as the *C-frequency weighting* which yields essentially the same constant response to sounds of any frequency between 32 and 8000 hertz.

*Sound level* is the quantity measured by a sound level meter. The unit of sound level and other levels is the decibel (dB). The quantity is actually a sound pressure level, but since sound pressure is the most commonly measured characteristic of a sound, it is feasible to omit the word "pressure" from the name of the quantity. The A-frequency weighting and the FAST time averaging approximately match the ear; they are understood when the simple term "sound level" is used.

The source for the above definitions and descriptions are pages 3–4 of Technical Note No. 544 of the Naval Ocean Systems Center, San Diego, California, which is entitled "Noise Measurements on Isla de Vieques, 4 April through 6 October 1978", by Dr. Robert W. Young. This is Defendants' Exhibit *62.*

**63.** This is the level of sound produced by the general area in which the sound measuring of a discrete noise source is to take place.

**64.** Interestingly enough, although it is possible by the use of seismographs and other similar instruments to take readings of shock-induced ground movements, Plaintiffs offered no such evidence but relied on so-called eye witness accounts of these phenomena. We do not credit said testimony.

A social survey taken by Plaintiffs on Vieques indicates that nearly 94% of the civilian residents feel that noise is not a problem in their neighborhood. In this same survey however, when the sample was asked about noise from Naval activity, 25% to 30% of the people stated they were highly annoyed. Twice as many people indicated that they would like to have Defendant Navy leave Vieques as those who indicated that they were highly annoyed with noise. This would seem to indicate that there is an attitudinal problem which bears little relation to the polled individual's perception of noise and thus these "eye witness" accounts cannot be deemed reliable when compared to "hard" scientific evidence to the contrary.

in the civilian areas anywhere near these levels.

Weather conditions are of great importance to sound and ground motion problems because they can bring about focusing. Under severe focusing conditions the peak flat SPL can be increased by up to 25 dB, and ground motion can be multiplied by a factor of up to 18. Under these weather conditions the predicted levels for Isabel Segunda are marginal for four Mark 83 bombs, which are 1000 pound bombs, detonated simultaneously.[65] Studies indicate that these weather conditions occur less than 10% of the days during the year, and during these days, Defendant Navy takes corrective action.

To prevent excessive noise caused by sound focusing phenomena, Defendant Navy has set up an elaborate noise abatement system for the inner range. Meteorological information from San Juan and St. Martin is collected twice a day and fed into a computer which is programmed to provide a sound focusing prediction for a given explosion. This data can be used for predicting trends of sound focusing on Vieques, but not for predicting absolute magnitudes of sound pressure levels. Thus a supplementary verification system has been set up whereby test bombs are dropped and reports received from listeners located in St. Thomas, St. Croix, Camp García and at the police station in Isabel Segunda. A meter on Crown Mountain in St. Thomas also sends a digital readout to the observation post in Cerro Matías. If the information received establishes high noise levels, operations are modified or curtailed, or in extreme cases, cancelled.

A compilation of the measurement of one-hour average sound levels made by both Plaintiffs and Defendants at 18 sites on Vieques over a six month period;[66] reveals that at all populated areas on Vieques, except Luján in October, the average day-night average sound level was about 58 dB. An analysis of this information reveals that most of the sound comes from natural sources: the biota, rain and thunder. Activities of local residents appear to be next in order as sound makers.

Twelve graphs of one-hour average sound levels illustrate that on many locations (except Luján in October), there was a sudden increase in sound just at sunset that is clearly not caused by Defendant Navy's activities. Furthermore, the one-hour average sound level remains high into the early morning hours, long after the cessation of Defendant Navy's military activities. Such night time sounds are well-known to be associated with the mating calls of the Puerto Rican tree frog (eleutherodoctylus portoricensis), also known as the coquí. This conclusion is reaffirmed when compared to evidence that the sudden increase in noise at sundown was not recorded on less humid days, a fact scientifically supported in that the coquí ceases calling soon after sundown on nights when the relative humidity goes below 85%.[67]

At Destino, the cumulated sound of big claps of thunder were measured by automatically activated equipment which operated there for ten days to measure the sound exposure levels. The sound exposure levels of two claps of thunder, which were specifically identified by a witness, were respectively 96.7 and 103.6 dB. These levels may be compared with the sound exposure level of 77.6 dB of a 500-pound (Mark 82) bomb at a distance of 3 miles. The differ-

**65.** Depending on the prediction technique, the air blast could be between 139 and 142 dB, and ground motion, 3.1 mm/sec. Predictions of blast over-pressure from artillery firing from the peninsula near Luján, a distance of about 5 kilometers, indicate that a peak flat SPL in the range of 108 dB would be produced by a muzzle blast equivalent to 10 pounds. Under extreme focusing conditions, the maximum peak flat SPL would be 133 dB.

**66.** Complete 24-hour data were available for 29 days in that six-month period. The day-night average sound level was calculated for each of these days. This is a 24-hour average sound level for which, as previously stated, there is a 10 dB emphasis on sound levels that occur before 7 A.M. and after 10 P.M.

**67.** See also *El Coquí: Unico en el Mundo*, by Jorge Luis León, "El Mundo", p. 15A, July 29, 1979.

ence of more than 20 decibels between the exposure levels of thunder and a bomb, means that the dropping of 100 bombs 3 miles from Destino would cause the same cumulated sound there (and the same average sound level) as would one big clap of thunder. (Thunder at Vieques is common in the summer).

Aircraft noise was measured at Destino while two Naval aircraft (Type A-6, which is a noisier aircraft than the A-7) made 25 northward runs over Target 2 (only inert bombs are dropped on this target); after a run they made a left turn and returned southward, east of Destino, to make another run. Fourteen of the runs triggered the automatic measuring equipment, yielding a typical sound exposure level at Destino, for one A-6 aircraft, of 79.3 dB. Inasmuch as the sound exposure levels of the other 11 runs were less than the smallest one that did activate the automatic measuring system, by the rules for levels, the typical sound exposure level of all 25 of the A-6 aircraft flying southward east of Destino was 76.7 dB.

In 1977–78 the average number of aircraft (all types) making runs on Target 2, and the climbing left turns thereafter, was 37.8 per day. An analysis of the distribution of operations for 20 days in August and September 1978 indicated that 3 per cent of aircraft operations occur after 10 p. m. In view of the 10–dB emphasis on sound levels at night, the yearly day-night average sound level at Destino, due to aircraft, would be 44 decibels.

As noted above, the day-night average sound level at Destino for the six months recorded due to all sources of noise, was about 58 dB. If the yearly aircraft operations described above were stopped entirely, the day-night average sound level at Destino would drop to 57.8 dB—an insignificant reduction of 0.2 dB.

Naval gunfire at the Vieques target range in September 1978 did not appreciably increase the noise at Destino, and presumably at other populated areas more distant from the guns. The evidence establishes a one-hour average sound level for the hour ending at 1:00 P.M. on September, 1978. This is the highest level at any time during the 10 days of monitoring at the Topside House, at Destino. This high level was due to thunder and rain. During the five hours 1:00 to 6:00 P.M. on September 29, 1978, the one hour average sound levels were respectively 40.3, 46.0, 42.5, 41.3 and 41.0 dB. These are among the lowest in the 10-day period notwithstanding that the Weekly Range Utilization work sheet for September 29, 1978 lists for the same five hours 7, 6, 4, 10 and 0 rounds respectively fired by 5-inch guns. The fact that the one-hour average sound level was 41.0 dB at Destino when there was no gunfire at all, and 41.3 dB with the firing of 10 rounds, means that the gunfire added appreciably nothing to the noise at Destino, even in the quietest hours.

The lowest one-hour average sound level, day or night throughout the 10-day period, was 39.6 dB, for the hour ending at 2:00 P.M. on 30 September 1978. During this quietest hour, 13 rounds were fired by 5-inch guns. This gunfire likewise added nothing significant to the prevailing ambient noise.

According to a report of the National academy of Sciences entitled "Guidelines for Preparing Environmental Impact Statements on Noise", 1977, the primary measure for describing noise in an environmental impact statement is the day-night average sound level. Various documents of the Environmental Protection Agency have named the day-night average (A-weighted) sound level as the primary measure of noise in the community. A day-night average sound level of 55 decibels is identified as the outdoor level in residential areas compatible with the protection of public health and welfare. This day-night average sound level is based on all sounds at the particular location. Along these same lines, should be further noted that the Acoustical Society of America's proposed American National Standard S.3.23, recommends a yearly day-night average sound level of between 50 to 65 dB for residential, single-family building where extensive outdoor use is anticipated.

The "hard" scientific evidence refutes Plaintiffs' allegation that military operations create shock waves and excessive noise that interfere with health and welfare of residents of Vieques. The yearly day-night average sound level at Destino due to Navy aircraft is less than 44 dB, and due to gunfire, less than 41 dB.

It would be impossible for planning purposes to adopt a day-night average sound level limit lower than 55 dB, because the outdoor living on Vieques is already adapted to a day-night average sound level at times as high as 58 dB, which as previously stated is due mostly to biota, rain, thunder and the activities of the residents thereof. If an attempt were made to allow residential building only at places where the yearly day-night average sound level is less than 50 dB, no one would be allowed to build on Vieques. Whatever limit is adopted, it must be applied to the *combination of all sounds*, without discrimination as to source.

■ For the above reasons it is our opinion that Plaintiffs' claims under the Act lack a basis in fact as well as law.

H. *The Coastal Zone Management Act and related matters under the Endangered Species Act and the Marine Mammal Protection Act*

Plaintiffs allege that Defendant Navy's activities are inconsistent with the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 *et seq.* (hereinafter called the "CZMA" in this section) or with the Puerto Rico Coastal Management Plan (hereinafter called the "Plan") promulgated pursuant to CZMA.

The "CZMA" is an all-encompassing statement of Federal policy [68] vis-a-vis the Nation's coastal zone, which provides for various programs and grants to the States related to this policy. 16 U.S.C. §§ 1454, 1455, 1456, 1456a, 1456b, 1456c, 1458, 1461. This statute is administered by the National Oceanic and Atmospheric Administration, an agency which is part of the United States Department of Commerce. Pursu-

ant to 16 U.S.C. §§ 1454–1455 said agency, on September 21, 1978, approved the Plan submitted by the Commonwealth of Puerto Rico.

The "CZMA" provides that:

"Each Federal agency conducting or supporting activities directly affecting the *coastal zone* shall conduct or support those activities in a manner which is *to the maximum extent practicable* consistent with approved state management programs." 16 U.S.C. § 1456(c)(1). (Emphasis added).

As can readily be seen, the bone of this contention centers around Plaintiffs' allegations that Defendant Navy's activities are inconsistent with the Commonwealth's Plan, while Defendant Navy claims that they have complied "to the maximum extent practicable." Defendant Navy also alleges that Plaintiffs' actions suffer from certain procedural defects.

There are various reasons why Plaintiffs' contentions are inappropriate, not least of which is that the "CZMA" and the Commonwealth's Plan are inapplicable to the Defendant Navy's lands in Vieques.

The "CZMA", at 16 U.S.C. § 1453(1) specifically excludes the lands in question:

"The term 'Coastal zone' means the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states, and includes islands, transitional and intertidal areas, salt marshes, wetlands, and beaches. The zone extends, in Great Lakes waters to the international boundary between the United States and Canada and, in other areas, seaward to the outer limit of the United States territorial sea. The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters. *Excluded from the coastal zone are lands the use of which is by law subject solely*

---

**68.** See 16 U.S.C. §§ 1451, 1452.

*to the discretion of or which is held in trust by the Federal Government, its officers or agents."* (Emphasis supplied). The legislature history of this provision leaves little doubt as to this interpretation.

"This section defines the various terms used throughout this bill. Of particular importance is the definition of 'Coastal zone.' The coastal zone is meant to include the *non-Federal* coastal waters and the *non-Federal* land beneath the coastal waters, and the adjacent *non-Federal* shore lands including the waters therein and thereunder. . . . The zone also includes such transitional and intertidal (sic) as salt marshes, wetlands, and beaches. The outer limit of the zone is the outer limit of the territorial sea, beyond which the States have no clear authority to act. All federal agencies conducting or supporting activities in the coastal zone are required to administer their programs consistent with approved state management program. However, *such requirements do not* convey, release or diminish any rights reserved or possessed by the Federal Government under the Submerged Lands Act or the Outer Continent Shelf Lands Act or *extend state authority to* land subject solely to the discretion of the Federal Government such as national parks, forests and wildlife refuges, Indian reservations and *defense establishments . . ."* (Emphasis added).

See Senate Report No. 92–753, 1972 U.S. Code Cong. and Admin.News, p. 4783. In the "Joint Explanatory Statement of the Committee of Conference", the Congress stated:

". . . The Conferees also adopted the Senate language in this section which made it clear that Federal lands are not included within a state's coastal zone. . . ."

See Conference Report No. 92–1544, 1972 U.S.Code Cong. & Admin.News, p. 4822.

Interestingly enough, the evidence on record shows that at a time when litigation was not contemplated, Plaintiff Environmental Quality Board agreed with this conclusion. A cursory review of the approved Plan reveals that the Environmental Quality Board specifically *excluded* Federal lands in Vieques from the provisions of the Plan.[69]

We are confronted, however, with certain provisions of the regulations promoted by the National Oceanic and Atmospheric Administration pursuant to the "CZMA", which state:

"Federal activities outside of the coastal zone (e. g., on excluded Federal lands . . . or landward of the coastal zone) are subject to Federal agency review to determine whether they significantly affect the coastal zone." 15 CFR 930.33(c).

We are somewhat at a loss to reconcile how Federal lands which are specifically excluded by the "CZMA" can nevertheless be subjected to review by administrative fiat. It would seem that the administrative inclusion of what has been legislatively excluded constitutes an *ultra vires* act. See, *Chrysler Corp. v. Brown*, 441 U.S. 281, p. 304, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). We need not decide this, however, as discussion of the merits of this controversy is also relevant to other pending issues.

Before entering into the merits of Plaintiffs' claims, however, we should consider the procedural objections raised by Defendant Navy to the effect that pursuant to the "CZMA's" mediation procedure (16 U.S.C. § 1456(h)), the Court should defer to the "primary jurisdiction"[70] of the administrative agency charged with implementing the "CZMA". This point is not well taken. The mediation procedures contained in the "CZMA" are only mandatory on the Secre-

---

**69.** See in *Exhibit CRB 400A* (footnote at page 185(a); see note on Map 9; page A–5; page B–20; Map 27; pages C–18, C–19).

**70.** See gen.: Davis, *Administrative Law Treatise*, 19.01–19.06; *United States v. Western Pa-*

*cific R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

tary of Interior [71] and not on either the Federal agency or the coastal states, a fact made abundantly clear by the regulations enacted pursuant to said statute. [72]

The substantive charges implicit in Plaintiffs' allegations hereunder are without merit. Although the nature of Defendant Navy's activities have a tendency towards provoking dramatic conclusions, a dispassionate analysis of the scientific evidence leads us to the conclusion that the negative impact of the Defendant Navy's activities on the coastal zone of Vieques is negligible, and if the truth be said, the control of large area of Vieques probably constitutes a positive factor in its over all ecology. The very fact that there are in the Navy zones modest numbers of various marine species which are practically non-existent in the civilian sector of Vieques or in the main island of Puerto Rico, is an eloquent example of *res ipsa loquitur*. [73]

An analysis of the various components which make for a healthy coastal ecosystem reinforces this view point:

(1) *The coral reefs and related communities*

Various studies were conducted related to alleged sedimentation of the reefs, particularly in the high impact areas of Bahía

Salinas del Sur and Bahía Icacos. These studies were conducted with a view to determining the extent and location of any deposition of terrigenous sediment [74] offshore, the location of areas of sediment damage to coral reefs, and the source and causation of any excessive sedimentation on corals. This is important in that sedimentation not only causes turbidity in the water and therefore blocks off light essential to the various life processes, but also because sedimentation brings about stress to the coral, which diverts energy from its reef-building functions.

These studies show that the nature of sediments contained in the waters at the eastern end of Vieques [75] are similar to those of the Virgin Islands region, an area unaffected by Defendant Navy's activity and world-renowned for the clarity of its waters. Although there are some corals which have been damaged by sediment, mostly in a narrow zone on the protected or leeward edges of the reefs, the percentage of terrigenous sediment on these corals is very low, and runoff does not pose a threat of any measurable magnitude to any reef-building organism. The sediment damaged coral is the result of deposits caused by natural forces rather than Defendant Navy's activities.

---

71. 16 U.S.C. § 1456(h) reads as follows:
"In case of serious disagreement between any Federal agency and a coastal state—
(1) in the development or the initial implementation of a management program under Section 1454 of this title; or
(2) in the administration of a management program approved under section 1455 of this title; the Secretary, with the cooperation of the Executive Office of the President, shall seek to mediate the differences involved in such disagreement. The process of such mediation shall, with respect to any disagreement described in paragraph (2), include public hearings which shall be conducted in the local area concerned."

72. 15 CFR 930.116 Judicial review:
"The availability of the mediation services in this subpart is not intended expressly or implicitly to limit the parties' use of alternate forums to resolve disputes. Specifically, judicial review where otherwise available by law may be sought by any party to a serious

disagreement without first having exhausted the mediation process provided for in this subpart."

73. Several marine turtles and manatees, of which we will later speak.

74. Runoff.

75. They reflect a high calcium carbonate sediment production rate typical to a small arid island. They are primarily biogenic aragonite with lesser amounts of calcite and a very small terrigenous fraction. Results of the percent insoluble analysis (used to determine percent terrigenous sediment) indicate a very low content of terrigenous sediment for all marine sediment samples, even in nearshore portions of shallow bays, except for those areas immediately adjacent to runoff sources: at the end of the "runaway" and adjacent to the inner gunnery target.

Comparative studies of the *Montastrea annularis,* an abundant coral[76] and a reef builder in Vieques and throughout the Caribbean, show that the effect of Defendant Navy's activities in Vieques has been negligible in terms of retarding coral growth rate. At present there is no irreparable damage to coral reefs in Vieques and what damage does exist can be repaired by the reefs' normal growth processes.

Although undoubtedly there are some indications that stray ordnance have caused some pocketing in a limited area of the reefs of Bahía Salinas del Sur and Bahía Icacos, the bulk of the damage observed in the reefs there and elsewhere is caused by the natural processes of bioerosion and wave action, which processes causes cracks, shearing and breakage in *Montastrea.* This type of coral damage is typical of any high energy (i. e., wave) area, such as eastern Vieques, and can easily be confused with damage caused by explosions.

A comparison of the Vieques reefs with those of the Virgin Islands is particularly apropos because of the almost identical geological, climatological, ecological and physical oceanographic parameters of these two areas.[77] Thus the analysis of Vieques reefs inside the area of naval activity vis-a-vis the control reefs in the Virgin Islands outside of any naval activity should establish whether any differences exist that can be attributed to naval presence on Vieques.

In the study conducted in the eastern Vieques range area (AIA/CAS/NGFS) ap-

proximately 10,000 sample points were taken representing a linear distance of over 10 kilometers. In the Virgin Islands 4,440 sample points were taken representing a linear distance of over 4.4 kilometers. The results of these two transact analysis reveal that the reefs in the eastern part of Vieques and those in the Virgin Islands[78] are almost identical in composition. The organic portions of these reefs show nearly identical percentages for all major reefs components. The amount of broken, diseased, and dead coral, and of coral rubble is very similar in both areas. This tends to demonstrate that both reef systems are subject to the same kinds and same amount of stresses. It is particularly significant when we consider that a large percentage of the reefs studied in the Virgin Islands[79] is within the control of the Park Service of the Department of Interior and subject to stringent regulations as to its use, all of which reinforce our conclusion that the vast majority of coral rubble in both the Virgin Islands and Vieques is the result of natural bioerosion and wave action.[80]

The living biomass of both of these reef systems exhibit a very low abundance of plants and sponges.[81] This is again the result of the rather shallow and exposed surf crest type environment of these reefs. Sea grasses, microalgae and sponges do not usually flourish in a high energy environment.[82]

The quantitative assessment of 4,974 sample points of reef building corals in

---

**76.** Whose growth rate is highly sensitive to sedimentation and can easily be measured by X–Ray techniques.

**77.** The biophysical similarity of these areas is mainly governed by two parameters: (1) they rise from a relatively shallow, sandy sea floor, and (2) they are subject to considerable wave energy.

**78.** Nine reefs were used in the Virgin Islands located in Dorothea Bay (St. Thomas), Little St. James, Johnson's Reef and Reef Bay (St. John's), and Tague Bay, Turner's Hole and Buck Island (St. Croix). Twelve reefs were used in Vieques commencing at Punta Este to Punta Icacos on the north coast and from Punta Este to Punta Matías on the south coast.

**79.** Johnson's Reef and Reef Bay in St. John and Buck Island in St. Croix.

**80.** As signified by the presence and dominance of the coral *Acrapora palmata,* which is a known indicator of high energy regimes.

**81.** 1–2%.

**82.** This is also reflected in the composition of the plant and sponge populations, i. e., a large percentage of the plant and sponge population found in the transits are represented by the Corallinaceae, a family of red, coralline algae; sponges include a high number of *Anthosignella varius,* forma *incrustans.* Both the Corallinaceae and the *Anthrosignella varius* species are adapted to high energy environments.

eastern Vieques reveals 14 points that show military impact. This is equivalent to 0.2% of the total reef and is representative of the damage attributable to the military to reefs in Vieques. This amount of damage is insignificant to the normal functioning of the Vieques reef ecosystem and clearly indicates that the impact of these activities on this system is negligible.

The coral reef fish communities in the Vieques range have also been compared with those in the Virgin Islands to determine differences in species, abundance, disease, parasitism and behavior.[83] The ten Vieques reefs studied showed 105 species, as compared to the seven Virgin Islands reefs, which showed 109 species. The average number of species counted per hour is also very similar with 45 for Vieques and 43 for the Virgin Islands respectively, as well as the abundance of species, with both areas having 19 species with abundance scores of over 50%.[84]

The sublethal effects of military ordnance were also studied. In over 50 hours of diving in Vieques, only one fish was observed with an open wound, and that was of undetermined origin. Disease was not seen in either Vieques or the Virgin Islands.[85]

No abnormal behavior was observed in either study area. In fact courtship and spawning of the Blue-Headed Wrasse was seen in all but two reefs in both Vieques and the Virgin Islands, a factor which scientists consider demonstrative of a healthy and undisturbed fish population.

The results of this study are of relevance to commercial fishing in Vieques in that 40% of the species recorded are also caught commercially. Evidence that the numbers of the fish in the range have not been reduced by military activity is that the catch-per-unit-effort has remained constant from 1968 through 1978, in contrast with the south central area off Vieques, which is in the civilian sector, where the catch-per-unit-effort is half its level 10 years ago, thus indicating over-fishing by the fishermen rather than a negative impact from Naval activities.[86]

We thus conclude that the health of the coral reef fish in Vieques is equivalent to those of the Virgin Islands and reflect a substantially intact coral reef ecosystem.

### (2) The sea-grass communities

The sea-grass communities located in Vieques at Bahía Icacos, Bahía Salinas, Bahía Salinas del Sur and Mosquito Bay were studied and compared to those of Tague Bay (St. Croix). Two grass species were studied: Thalassia testudinum and Syringodium filiforne. Average sea grass productivity at Vieques is 3.1 gm/m$^2$/day as compared to 2.8gm/m$^2$/day at St. Croix, thus showing slightly higher values in Vieques.[87] Furthermore, a comparison of the biomass weight of these two areas implies that the standing amounts of sea grass in both places is approximately equal.

The sea-grass studies thus show that Vieques has moderately productive sea-grass

---

83. The Vieques study area was the eastern part of Vieques, the selection of reefs being those closest to the target range, the theory being that these would show the greatest biological impact by Naval activities. Ten reefs were studied in Vieques and seven in the Virgin Islands.

84. Because many of the species occur in large schools, it is impossible to individually count their number. It is thus, standard procedure to use an index of abundance score, in which the quantity of a species is placed into one of five numerical categories and an estimate of their numbers is made within a numerical range.

85. A large external isopod parasite was counted on the Yellowedged chromia, a very abundant fish in both study areas, showed almost

identical average sightings per reef, 1.6 for Vieques and 1.5 for the Virgin Islands.

86. This factor together with others that were brought out during the trial, such as the continued poaching by fishermen of turtles and their eggs, causes us to conclude that the Vieques fishermen are not as conservation-minded as they would have us believe.

87. The average value for Vieques sea grass approximately of 3.1 gm/m$^2$/day compares favorably with world averages of daily productivity of cultivated wheat (2.5), corn (3.0) and rice (3.6).

beds, that are healthy, and typical of seagrass beds throughout the Caribbean.

A sampling of grassbeds fish yielded 25 species in Vieques and 35 species in St. Croix. The density of fish in St. Croix was 57.9 fish/sample compared to 21.5 fish/sample on Vieques. Species diversity on St. Croix was 3.107 as against 2.787 for all samples.

There is no doubt but that the impact of ordnance on grass beds creates craters and removes sediment and rhizones at the point of impact. This damage is limited to the immediate area of impact. No craters were observed larger than about six feet in diameter and these are principally limited to the waters in the immediate vicinity of Bahía Icacos, Bahía Salinas, and Bahía Salinas del Sur in the AIA/CAS/NGFS zone. None appear to be enlarging or becoming blowouts.

Blowouts, which are migrating holes in grassbeds that erode at one edge while recovering at another edge, occur on the northwest end of Vieques. Those blowouts were caused mainly during the construction of a fresh water pipe from Puerto Rico to Vieques, by Commonwealth employees or agents.

Grassbeds can recover from physical disturbance, and most of those on Vieques show signs of recovery. Nearly all craters show growth of green algae such as *Penicillus* and *Halimeda*, which are known early colonizers in the Caribbean. At least two craters north of Punta Gato show colonization by *Thalassia*, the final state in recovery.

A comparison between aerial photographs of Bahía Icacos, Bahía Salinas and Bahía Salinas del Sur taken in 1936–37, which were taken in 1978, show an increase rather than decreases in the total sea-grass areas. In 1937 Bahía Salinas del Sur, an area of approximately 143.17 hectarea (Ha), contained about 35.7 Ha of seagrass of which 15.3 Ha were dense seagrass. In 1978 this area has 85 Ha of seagrass of which 63.5 Ha is dense seagrass. In Bahía Icacos and Salinas, a total area of about 33.8 Ha, there was an increase in seagrasses of from 7.5 to 17.4 Ha during this same period.

In our opinion the damage to seagrass from the activities of Defendant Navy is neither substantial, permanent nor irreversible. As a matter of fact, even if all the seagrass in the eastern end of Vieques were damaged or removed, this would constitute but a relatively small portion of the seagrass productivity of the entire island, as the largest seagrass beds are located not in the AIA/CAS/NGFS zones but rather in the western portions of Vieques.

Studies were also conducted of the benthic faunal communities associated with seagrasses around Vieques. The object of these studies was to quantify benthic (in fauna), epibenthic (live on sediment) and cryptic (live on and among the blades) fauna which provide the main link between primary production of the area and higher trophic level consumers, many of which are valuable sport and commercial species, and to assess the condition of these communities.[88]

The fauna of the samples was dominated numerically by small polychaetous annelids, with no sample dominated by any one species or even one family of organisms. No pattern was discernible that could be associated to Naval activity. For example, a station within a "very disturbed area" yielded a high abundance of organisms and had an almost exact analog in a station which had similar species and abundance but was more than 1 kilometer to the west, outside the impact area. The station with the highest seagrass biomass, off Punta Gato, had the fewest animals. We thus must conclude that benthic abundance can not be positively correlated to seagrass standing crop biomass.

Furthermore, any implication that military and other debris in a seagrass meadow

88. Six sampling stations were within the impact zone in Bahía Salinas and Bahía Salinas del Sur, and five were in non-impact stations at Ensenada Honda, Puerto Negro and Mosquito Bay.

is always detrimental is erroneous.[89] A change in the vertical relief in a seagrass bed or sand bottom acts as an attractant to important organisms such as spiny lobsters. Natural phenomena, such as blowouts, also provide this vertical relief and in Mosquito Bay serve as a surrogate reef, attracting concentrations of fishes and crustaceans usually found on patch reefs which are not present in the Bay.

### (3) Mangrove wetlands

Mangroves are an important segment of the coastal ecosystem. See: *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, supra. They are valuable as habitat for marine and estuarial vertebrates and invertebrates, are an important segment of the marine detrital food chain, and act as shoreline stabilizers.

As previously alluded to, there are several areas of mangrove in Vieques,[90] most of which are within Defendant Navy's properties. Commencing from west to east the important mangrove forests are the Punta Arenas-Laguna Kiani (199.49 "cuerdas")[91] and Laguna Playa Grande (57.68 cdas.) forests in the NAF, and the Puerto Mosquito (102.12 cdas.), Puerto Ferro (48.18 cdas.), Bahía Tapón (20.36 cdas.), Bahía Chiva (34.-27 cdas.), Bahía Yanuel (27.48 cdas.) and Ensenada Honda (86.18 cdas.) forests along the southern coast of the GMA. There are no mangrove stands of any significance or importance in either the SIA or AIA/CAS/NGFS zones.

Two of the above mangrove areas, Punta Arenas-Laguna Kiani and Puerto Mosquito, are under stress although the cause of the stress cannot be attributed to Defendant Navy's activities.

In the Punta Arenas-Laguna Kiani mangrove complex there is a large area of dead mangrove in the Laguna Boca Quebrada area. Plaintiffs claim that the cause of this mortality is the closing of an alleged access to the sea with a consequent rise in the salinity of the entrapped waters, a factor which is highly detrimental to mangrove forests. However, pre-1940 aerial photographs and maps of this area show the existence of a continuous roadway between that mangrove forest and the sea and thus clearly establish that the present day road existed before Defendant Navy's arrival in Vieques. Although there is a dry stream bed to the south of Punta Boca Quebrada which is crossed by a tramway construction, this stream bed, as appears from a map of the area,[92] is not connected to the mangrove swamp but rather serves the watershed to the north of Monte Pirata. More recent maps show a channel-like connection between Laguna Boca Quebrada and the sea, but no evidence was presented as to any activity of Defendant Navy which could support a finding that Defendant Navy has caused its blockage. If such a channel did in fact exist, it would be as reasonable to presume that it has filled from natural causes. We might add that it would be a simple operation to reopen such a channel because of the proximity of Laguna Boca Quebrada to the sea.

The second mangrove area of immediate concern is that on the western side of Puerto Mosquito, behind the public beach at Ensenada Sombe. This mangrove, although bordering in part on the Naval reservation (GMA), is actually in the civilian sector. The cause of the stress to this forest is again the hypersalinity of the soil, this time brought about by the blockage or diversion of the fresh water runoff and ground water. This has been caused by the rerouting of the civilian road between Esperanza and Isabel Segunda and by the excessive pumping of wells in the area. Neither

---

**89.** Cf. 16 U.S.C. § 1220 *et seq.*

**90.** All four varieties of mangrove common in the Caribbean are found in Vieques: red mangrove (*Rhizophora mangle*), white mangrove (*Laguncundora racemosa*), black mangrove (*Avicennia nitica*), and button mangrove (*Conocarpus erecta*).

**91.** A "cuerda" is the equivalent of .97 acres.

**92.** As well as from the helicopter inspection of the area.

of these factors can be attributed to Defendant Navy.

In our opinion the activities of Defendant Navy have a negligible impact on the mangrove ecosystem of Vieques.

#### (4) *Bioluminescent bays*

There is no credible evidence on the record to support any finding that any activity of Defendant Navy has in any way affected the bioluminescent bays or the organisms that thrive therein.

#### (5) *Beaches*

There are numerous beaches throughout the Defendant Navy's property in Vieques. With the exception of those in the confines of the AIA/CAS/NGFS zones the public is allowed permission to use them when maneuvers are not in progress. Green Beach (Punta Arenas), as previously stated, is in fact used almost exclusively for recreational purposes by both service personnel and civilians.

As indicated, the bulk of the amphibious operations take place at Blue Beach on the South coast. These operations are not on a continuous basis but rather take place two or three times a year. There is no indication that the use of this beach for these purposes causes any significant negative impact on the beach or its related surroundings.

The beaches within the AIA/CAS/NGFS zone, namely those in Bahía Salinas del Sur, Bahía Icacos and Bahía Salinas frequently receive direct ordnance impact. This may result in debris being strewn throughout as well as occasional unexploded rounds or bombs. The latter are periodically cleared or detonated in place by demolition crews of Defendant Navy. Quite obviously under its present use, these particular beaches would be inappropriate for use by the public. But in our opinion, the evidence is at best inconclusive that these activities have a *substantial* negative ecological impact on these beaches. In any event we conclude as a matter of law that because of the limited area in question and because of the intrinsic nature of the activity being conducted, Defendant Navy has "to the maximum extent practicable" conducted activities in compliance with the Act.

#### (6) *Wildlife*

Generally speaking, and leaving aside fish species already described, the wildlife in Vieques' coastal zone consists of various aquatic, mangrove, and sea birds species, various kinds of turtles, and lizards, and the manatee.

Birds, however, are the dominant form of wildlife in Vieques, and the coastal zone is no exception.[93] The existence, relative

---

**93.** The following is a summary of the bird species that can be found in the various areas of the Vieques coastal zone, keeping in mind that the abundance of number and of species to be found at any given time is subject to seasonal migrating variation:

(1) Mangrove forests: Yellow warbler (*Dendroica petechia*), Banaquit (*Coereba flaveola*), Greater Antillean Grackle (*Ouiscalus niger*), Black-whiskered Vireo (*Vireo altiloquis*), Grey Kingbird (*Tyrannus dominicensis*) Green-Throated Carib (*Sericotes holosericeus*), Zenaida Dove (*Zenaida aurita*), White-crowned Pigeon (*Columba leucocephala*) Mangrove Cuckoo (*Coccyzus minor*), Black-crowned Night Heron (*Nyctanassa violacea*), Great Blue Heron (*Ardea herodias*), Green Heron (*Butorides virescens*), Little Blue Heron (*Florida caerulea*), Cattle Egret (*Bubulcus ibis*), Great Egret (*Egretta alba*), Snowy Egret (*Egretta thula*).

(2) Mangrove lagoons: Common Gallinule (*Gallinula chloroopus*), Green Heron (supra), Clapper Rail (*Rallus longirostris*), Little Blue

Heron (supra), White checked Pintail (*Anas bahamensis*), Yellow-crowned Night Heron (supra), Tricolored Heron (*Hydranassa tricolor*) Snowy Egret (supra), Pied-billed Grebe (*Podilymbus podiceps*) Brown Pelican (*Pelecanus occidentalis*), Magnificent Frigatebird (*Fregata magnificens*) Great Blue Heron (supra), Great egret (supra), Black crowned Night Heron (supra), Least Bittern (*Ixobrychus exilis*), Blue-wing teal (*Anas discors*), Ruddy Duck (*Oxyura jamaicensis*), Osprey (*Pandionhaliaetus*) Caribbean Coot (*Fulica caribaca*), Laughing Gull (*Larus atricilla*) and Least Tern (*Sterna alifrons*).

(3) Mangrove mudflats and saltflats: Black-necked Stilt (*Himantopus mexicanus*), Thick-billed Plover (*Charadrius wilsonia*), Semipalmated Sandpiper (*Charadrius semipalmatus*), Ruddy Turnstone (*Arenaria interpres*), Short-billed Dowitcher (*Limnodromus griseus*), Black-bellied Plover (*Pluviales squatacola*), Greater Yellow Legs (*Tringa melancolucca*),

abundance, and variety of bird life in Vieques, and in particular within Defendant Navy's properties, clearly negate Plaintiffs' contentions to the effect that the activities conducted therein are unfavorably affecting said wildlife. We do not credit evidence presented to the contrary.

### a. The Endangered Species Act

As previously stated, various species of Vieques' wildlife are listed as threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*[94] and these should be discussed herein with some particularity. The endangered species include the Brown Pelican, the Hawksbill Turtle, the Leatherback Turtle and the West Indian Manatee. See 50 CFR § 17.11. The threatened species include the Green Turtle and the Loggerhead Turtle. See 43 Fed.Reg. 32800.

It is a declared purpose of this statute "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] that all Federal departments and agencies . . . seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(b) and (c). Generally speaking the "taking" by any person of any endangered species within the United States or its territorial sea is prohibited. 16 U.S.C. § 1538. This statute defines "taking" as including to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The law encompasses within the term "person", any "officer, employee, agent, department, or instrumentality of the Federal Government." 16 U.S.C. § 1532(13). All Federal departments and agencies are required to carry out programs for the conservation of threatened and endangered species, and to insure that actions "authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered . . . and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical." 16 U.S.C. § 1536(a).

It is an undisputed fact that all of the mentioned threatened or endangered species can be found in Vieques or its surrounding seas.

The substance of Plaintiffs' allegations is that Defendant Navy's activities constitute prohibited "takings." It is further alleged

---

Semipalmated Plover (*Charadrius semipalmatus*), Spotted Sandpiper (*Actitis mocularia*), Lesser Yellow Legs (*Tringa flavipes*), and the Least Tern (*supra*).

(4) Beaches: Thick-billed Plover (*supra*), Royal Tern (*Sterna maximus*), and Yellow-crowned Night Heron (*supra*).

(5) Offshore cays and rocky coastline with adjacent cliffs: Caribbean Martin (*Progne dominicensis*), Yellow Warbler (*Dendroica petechia*), Ground Dove (*Columbina passerina*), Green-throated Carib (supra), Grey Kingbird (*supra*), Caribbean Elaenia (*Elaenia martinica*), Zenaida Dove (*supra*), White-tailed Tropic-bird (*Phaethon lepturus*), Brown Pelican (*supra*), Brown Booby (*Sula leucogaster*), Magnificent Frigatebird (*supra*), Yellow-crowned Night Heron (supra), American Oystercatcher (*Haematopus ostralegus*), Laughing Gull (*supra*), Roseate Tern (*Sterna dougallii*), Bridled Tern (*Sterna anaethetus*) and Pearly-eyed Thrasher (*Margarops fuscatus*).

(6) Oceans
(a) Onshore waters and bays: Brown Pelican (*supra*), Magnificent Frigatebird (*supra*), Royal Tern (*supra*), Laughing Gull (*supra*), Brown Booby (*supra*), Osprey (*supra*), and Least Tern (*supra*).

(b) Offshore waters: White-tailed Tropicbird (*supra*), Brown Booby (*supra*), Roseate Tern (*supra*), Sooty Tern (*Sterna fuscata*) and Bridled Tern (*supra*).

94. 16 U.S.C. § 1532:

"(6) The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range . . .

. . . . .

"(20) The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."

The Statute provides for a procedure whereby the Secretary of the Interior, by regulation, establishes what species are threatened and/or endangered. 16 U.S.C. § 1533.

There is no flora from any part of Puerto Rico, including the Island of Vieques, which is currently listed as endangered or threatened.

that these actions are contrary to law in that they fail to ensure that the species' continued existence is not jeopardized or that habitat deemed critical is not destroyed or adversely modified.

It is best to discuss these species separately.

### i. *The Brown Pelican*

Brown Pelicans are colonial nesters, who seem to prefer to construct their nests on perches in small coastal islands. In Vieques, they have established a nesting colony on Cayo Conejo (also referred to at times as No-Name Island), a two acre island located just off-shore from Bahía Salinas del Sur on the AIA/CAS/NGFS zones.

Plaintiffs claim that the Cayo Conejo rookery is one of only two in Puerto Rico, the other one being in a small island off La Parguera, in the South coast. They claim that Defendant Navy's activities disturb the Brown Pelican's reproductive activities because they prefer quiet, secluded surroundings to carry out these functions.

Although these are plausible arguments, we are immediately confronted with various factors which militate against our adoption of the same. The most obvious one is the very fact that the pelicans have chosen Cayo Conejo as a nesting site. This rookery has been known to exist since at least 1971. If pelicans are as susceptible to military activity as is alleged one wonders why they established a nesting colony in such close proximity to Vieques' most active military zone. In fact, the "Puerto Rico Coastal Management Program and Final Environmental Impact Statement" (referred to in Section IV H above, as the "Plan", prepared by the Department of Natural Resources of the Commonwealth), lists the mudflats in San Juan Bay, a commercial harbor with considerable traffic and in whose midst is located an important local airport, "as [a] nesting area[s] by the Brown Pelican" (su-

pra, p. C–1).[95] More in point however, there is no evidence of a decline in the total population of the Vieques pelicans, a factor which would seem to bear a direct relationship to the breeding rate of the resident birds, and thus on whether the Cayo Conejo colony is being disturbed by Defendant Navy's activities.

There is more specific data to substantiate these conclusions. Studies conducted of the Cayo Conejo group showed a clutch size of 2.58 eggs per nest, precisely the same clutch size found in Florida colonies during an eight year study. This tends to demonstrate that the Vieques colony has not suffered during the nesting season. The birds observed in Vieques had an age-class distribution with a high percentage of "birds of the year", and a reasonable number of subadults, which also indicates a healthy population with a stable age-class distribution. Direct observation of the Cayo Conejo group during both periods of military activity and otherwise, showed no noticeable reaction by pelicans during military operations. In fact pelicans were observed engaging in low-intensity courtship behaviour during operations, even though adult birds are most susceptible to any form of disturbance during courtship activity. This is supportive of scientific opinion that birds, including Brown Pelicans, habituate themselves to noise and to the presence of airplanes.

From personal observation by the Court, there is no evidence of recent military activity taking place on Cayo Conejo. The only evidence that could be observed of any military activity on this island were the remains of some craters, completely covered over by grass, and some rusted metal fragments. In fact, the major disturbance to this nesting colony is brought about by visits of fishermen who go onto the cay to collect snails. By restricting the presence of humans in this area, Defendant Navy has *de facto* provided a refuge for the pelicans (and other wildlife).

**95.** The large number of Brown Pelicans that can be seen throughout Puerto Rico would seem to put in question their "endangered" status, in fact if not in law (this can not, of course, be legally questioned except through

the administrative procedures encompassed in 16 U.S.C. § 1533). In San Juan Harbor for example, many could be seen, even within sight of undersigned Judge while sitting on the bench presiding in this case.

Although there is no designated critical habitat in Vieques for Brown Pelicans, Defendant Navy has proposed a cooperative agreement with the U.S. Fish and Wildlife Service establishing Cayo Conejo as a managed resource for Brown Pelicans. Under this agreement overflights are restricted to altitudes above 500 feet and no personnel will be permitted to visit the cay except on ornithological or operational safety matters. This altitude restriction is presently contained in Defendant Navy's Range User's Manual.

### ii. The Sea Turtles

Here again we are confronted with the fact that the sightings of the turtles and of their nests are almost exclusively within Defendant Navy's properties or in the waters adjacent thereto, and again in close proximity to or within the AIA/CAS/NGFS zone. Plaintiffs contend that this dictates the automatic curtailment of Defendant Navy's activities, without considering that it is perhaps this presence that accounts for the existence of the species there.

In any event, we must take into account that Vieques is not considered a major turtle site in terms of the range of the species here in question. This is a fact which has been officially recognized by the failure to designate as critical habitat any area in Vieques for any of these species.

The evidence shows that the population of green turtles on Vieques does not represent a significant proportion of the total number of these species. Again in terms of the total numbers of the species, the number of loggerhead turtles in the Caribbean is quite small, and those that can be found in Vieques insignificant. Even the presence of the leatherback and hawkbill turtles in Vieques is not of importance in terms of relative numbers when compared to the various other Caribbean sites where it is found, notwithstanding that these two species are the most abundant of the sea turtles to be found in Vieques.

Furthermore, no credible evidence was presented to show that any activity of Defendant Navy is affecting the sea turtles in Vieques in any significant manner.[96] The record shows that the greatest threat to these species in Vieques, as throughout the Caribbean, has been the unrestricted fishing that has taken place.[97] There is evidence that this fishing, although presently illegal under the Endangered Species Act, is still taking place around Vieques, together with the poaching of sea turtle eggs and nesting adults. Defendant Navy's presence on Vieques, together with the restrictive nature of its activities, has had some measure of benefit to the turtle population by precluding some of the illegal fishing and egg poaching.

### b. The Manatee and the Marine Mammal Protection Act

The Manatee (*Trichechus manatus*), a large herbivorous marine mammal of the order *Sirenia*, is protected by the provisions of both the Endangered Species Act, supra, and the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.*, see specifically 16

---

**96.** Although it is undoubtedly true that if a heavy tracked vehicle were to pass over a turtle nest the nest would be destroyed, it is clear speculation to say that this is taking place. The areas used by the turtles for nesting sites are located in the northeastern extremities of Vieques in beaches which are mostly isolated and not used for landings.

Copious testimony was also presented dealing with a theory to the effect that the light from parachute flares attracts the hatchlings inland, thus causing their destruction. We consider this such an absurd argument when one considers the many other sources of light in Vieques, including the moon, that it bears no further comment.

**97.** The records of catches of a Vieques fisherman were presented at the trial. These showed a steady decline in the catches, as the adult reproducing stock was progressively decimated. The removal of adult sea turtles from the population is much more serious than the removal or destruction of sea turtle eggs. The numbers of hatchlings that attain adulthood is very low, due to natural causes such as predation by sea gulls. It is thus imperative that there be large number of eggs laid to overcome this high natural mortality rate. The killing of an adult has the obvious result of reducing to zero the reproduction rate of that adult.

U.S.C. § 1362(5).[98] This later statute also prohibits the "taking" of the manatee by any person in waters or on lands under the jurisdiction of the United States (16 U.S.C. § 1372(2)(A)). The definitions of "taking" and "person" in this law are similar to those contained in the Endangered Species Act. 16 U.S.C. § 1362(10), (13).

The evidence presented demonstrates that the manatee is found in larger numbers and concentration in Vieques than in any other area of Puerto Rico except perhaps the Naval Reservation at Roosevelt Roads, across Vieques Sound. We do not deem it coincidental that both of these areas are under the control of Defendant Navy.

The Vieques group, which is concentrated almost exclusively in the sea grass beds around Punta Arenas (in the northwest), consists of between 13 to 25 manatees and includes a significantly large proportion of calves. It remains questionable whether the manatee population of Vieques is totally discreet from that of Roosevelt Roads, particularly since there are no year round fresh water sources on Vieques, which seems to be a periodic requirement for manatees.[99] However, the northwestern sector of Vieques, in addition to containing large areas of sea grass, has sediment of sufficient penetrability as to allow the manatee to easily root for the base of the grass, the preferred manner of feeding of manatee.

As previously indicated, the area of Vieques preferred by the manatee is an area almost totally devoid of any military activity. Again, although no area of Puerto Rico has been designated as critical habitat, we can find no activity of Defendant Navy which can be said to be affecting in any adverse way the manatee or its habitat.

The facts which we have found proven establish as a matter of law that there has been no "taking" of any of the above-mentioned endangered or threatened species under either the Endangered Species Act or, as applicable, the Marine Mammal Protection Act.[100] Furthermore, as previously indicated, no "critical habitat" designation has been effectuated as to any of these species pursuant to the procedures established by the Endangered Species Act, 16 U.S.C. § 1533. Lastly, the actions filed under both the Endangered Species Act and the Marine Mammal Protection Act suffer from serious procedural defects: as to the first statute, Plaintiffs have failed to comply with the 60-day notice requirement of 16 U.S.C. § 1540(g)(2),[101] which we deem to bar this citizen suit, (Cf. *Loveladies Property Owners Assn. v. Raab*, supra, at page 281); and as to the second, said Act not only fails to establish "citizen suits" for its enforcement but rather specifically limits such powers to the Secretary,[102] and thus Plaintiffs lack standing herein to enforce this Act.[103]

**98.** "The term 'marine mammal' means any mammal which

(A) is morphologically adapted to the marine environment (including . . . members of the orders Sirenia . . .)."

**99.** There are various fresh water streams in and around the Roosevelt Roads area.

**100.** 50 C.F.R. § 17.3 defines "harass" and "harm" to mean, respectively:
"An intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral pattern which include but are not limited to, breeding, feeding or sheltering."
"An act or omission which actually injures or kills wildlife, including acts which significantly disrupt essential behavioral pattern, which include, but are not limited to, breeding, feeding, or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of harm."

**101.** Which reads in its pertinent part:
"(A) No action may be commenced under subparagraph (1)(A) of this Section [citizen suits] (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation . . ."

**102.** 16 U.S.C. § 1377. The Secretary can delegate enforcement to any State. 16 U.S.C. § 1379(c). No such delegation has taken place here.

**103.** See discussion Section IV E above.

■ The sum total of the matter discussed under Section IV H above of this decision is thus that Plaintiffs have failed to state claims under either the Coastal Zone Management Act, the Endangered Species Act or the Marine Mammal Protection Act.

### I. *The National Historic Preservation Act and Executive Order 11593.*

Plaintiffs allege violations by Defendant Navy of Executive Order 11593 ("Protection and Enhancement of the Cultural Environment", May 13, 1971, 36 F.R. 8921, noted at 16 U.S.C. § 470) and of Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f), referred to as the "Act" in this Section.

Section 2 of the Executive Order states in part, that federal agencies shall:

"(a) no later than July 1, 1973, with the advice of the Secretary of the Interior and in cooperation with the liaison officer for historic preservation for the State or Territory involved, *locate, inventory, and nominate* to the Secretary of the Interior all sites, buildings, districts, and objects under their jurisdiction or control *that appear to qualify for listing on the National Register of Historic Places.*

(b) *exercise caution during the interim period* until inventories and evaluations required by subsection (a) are completed to assure that any federally owned property that might qualify for nomination is not inadvertently transferred, sold, demolished or substantially altered. The agency head shall *refer any questionable actions* to the Secretary of the Interior for an opinion respecting the property's eligibility for inclusion on the National Register of Historic Places. The Secretary shall consult with the liaison officer for historic preservation for the State or territory involved in arriving at his opinion. Where, after a reasonable period in which to review and evaluate the property, the Secretary determines that the property is likely to meet the criteria prescribed for listing on the National Register of Historic Places, the Federal agency head shall reconsider the proposal in light of national environmental and preservation policy. Where, after such reconsideration, the Federal agency head proposes to transfer, sell, demolish or substantially alter the property he shall not act with respect to property until the Advisory Council on Historic Preservation shall have been provided an opportunity to comment on the proposal." (Emphasis supplied).

Section 106 of the National Historic Preservation Act (16 U.S.C. § 470f) states that:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object *that is included in or eligible for inclusion* [104] *in the National Register.* The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking." (Emphasis added).

The National Register referred to is a listing maintained by the Secretary of the Interior ". . . of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, and culture . . ." 16 U.S.C. § 470a(a)(1). The Commonwealth of Puerto Rico is eligible to have listings in the National Register (16 U.S.C. § 470a(b)(1)). There are three locations in Vieques that are enumerated therein: the fort and light house at Isabel Segunda, and Frenchman's House at Esperanza. See 44 Fed.Reg. 7416, 7561 (Feb. 6, 1979).

---

**104.** The phrase "or eligible for inclusion in" was added to the Act by Pub.L. 94–422 in 1976.

Criteria for inclusion in the National Register is established in 36 C.F.R. 800.10(a):

" 'National Register Criteria' means the following criteria established by the Secretary of the Interior for use in evaluating and determining the eligibility of properties for listing in the National Register: The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structures, and objects of State and local importance that possess integrity of location, design, setting, materials, workmanship, feeling and association and:

(1) That are associated with events that have made a significant contribution to the broad patterns of our history; or

(2) That are associated with the lives of persons significant in our past; or

(3) That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual, distinction; or

(4) That have yielded, or may be likely to yield, information important in prehistory or history."

There is little doubt in our mind but that Defendant Navy did not at any time prior to the commencement of the present actions locate, inventory and/or nominate any site or otherwise that appear to qualify for listing on the National Register, as required by Section 2(a) of the Executive Order.

After these actions were filed, however, Defendant Navy has conducted an extensive survey to such effects.[105]

Prior to this survey twenty-nine archeological sites were known to exist in Vieques, of which all but two were in the civilian sector. The survey found an additional forty-five new sites, forty of which are on military property. The survey also located seventeen historical sites and structures, thirteen of which are on Naval lands.

There are at present no significant archeological or historical sites in the AIA/CAS/NGFS zones. Any that may have existed there have in all probability been destroyed.[106]

**105.** The methodology of this survey began with a literature search to provide an overview of the cultural resources on Vieques for historic and archeological sites. Material found at the Institute of Puerto Rican Culture and at the University of Puerto Rico was reviewed, and various persons were contacted in Vieques to supplement the documentary search. Thereafter a predictive base was prepared from which locations could be identified for purposes of evaluation.

The field work was performed in two phases. The first phase was the survey of the target area east of Cerro Matías, which took thirteen and a half days. The second phase involved a sampling program for the remainder of the island and required one hundred and eighteen man days of effort. The survey methods allowed a survey of 55% of the NAF and 34% of the eastern area.

Because of the size of the area on Vieques, it would take at least two years and hundreds of thousands of dollars to conduct a 100% survey. No other area of a comparable size to Vieques has been surveyed 100%, nor do we believe this to be the intention or a requirement of the law.

In our opinion the sampling method devised by Defendant Navy provides an unbiased sample of the archeological sites on the entire island of Vieques. This method divided Vieques

into 665 sectors each of which measured 500 by 500 meters. A group of sectors (10%) were picked at random from a random numbers chart. Another 10% of the total of 665 sectors was chosen by picking the first number at random and then selecting all the other sectors at constant intervals. The third group was picked based on the knowledge of experts as to where archeological and historic sites should be found.

On the field, the squares which were to be surveyed were walked at intervals of 100 meters from East to West, making several passes, and then from North to South at the same intervals. Four hundred twenty one squares, or 63.2% of the total squares on the island were reviewed in one manner or another. Defendant Navy's archeological survey teams actually walked 1.62% of the total surface of the island.

**106.** In all fairness we should state that this could very well have happened prior to 1971. See also footnote 97. It is in any event an academic point. The fact is that this area is at present archeologically and historically sterile. We might add however, that we have some doubts as to whether this area was ever a likely place for such findings. The evidence tends to indicate that in historic times there was little

The sites which are located West of Cerro Matías, however, are not in any immediate danger of harm or destruction by virtue of Defendant Navy's activities.

 Although Defendant Navy admits that some of the newly discovered sites may be eligible for listing in the National Register no action has been taken to nominate them to the Secretary of the Interior or to seek his opinion respecting said eligibility. Thus Defendant Navy is in violation of Section 2(a) and (b) of Executive Order 11593. This order was issued pursuant to statutory authority [107] and has the force of law. Cf. *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (C.A.5, 1967), cert. den. 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); *Association for Women in Science v. Califano*, 566 F.2d 339, 344 (C.A.D.C.1977). Violation of this Order may be privately enforced. *Aluli v. Brown*, 437 F.Supp. 602, 608–609 (D.C.Haw., 1977) rev. in part, 602 F.2d 876 (C.A.9, 1979); *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323, 1331 (S.D.N.Y., 1975).

### J. Claims under the First and Fifth Amendments and Related Matters

### A. Alleged violations of agreements, Presidential Orders and Congressional Directives.

Plaintiffs claim that Defendant Navy has violated an agreement, and commitments with the Commonwealth of Puerto Rico, not to transfer to Vieques operations formerly conducted by Defendant Navy in the Island of Culebra. It is also alleged that Defendant Navy in transferring these activities, violated Presidential and Secretary of Defense orders not to effectuate a transfer from Culebra to an alternate site in Puerto Rico, without prior Commonwealth approval. Lastly, Plaintiffs contend that Congress, in enacting various Military Construction Authorization Acts [108] intended "to exercise direct legislative supervision of the decision-making of the Department of Defense" with respect to the alleged Culebra transfer, by requiring the Secretary of Defense to study the problem, negotiate and obtain an agreement from the Commonwealth Government prior to any transfer within Puerto Rico, and report and recommend to Congress on the outcome of said matters.

The roots to these allegations are traceable to a controversy that commenced in this Court in the case of *Feliciano v. United States*, 297 F.Supp. 1356 (D.P.R., 1969), aff'd 422 F.2d 943 (C.A.1, 1970), cert. den. 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). At its inception it involved a challenge to the executive order which created the Culebra Island Naval Defensive Sea Area. The Navy won that legal battle but lost the political war that ensued, which culminated in the cessation in 1975 of all weapons training activities in Culebra Island.

The many complex, intertwining happenings that took place between the *Feliciano* case and the Culebra cease fire are the alleged basis of the present contentions.

In October 1970 Congress enacted the Military Construction Authorization Act of 1971 (P.L. 91–511, 84 Stat. 1204). Section 611 of this law [109] required the Secretary of

activity there, and in prehistory, it was most probably a transit zone rather than one of settlement.

Some support for this theory is found in comparing St. Croix and Vieques, both of which are archeologically akin because of the similar nature of their soil types, their cultural sequences, and their geographic proximity. In St. Croix, as in Vieques, no archeological sites have been found on its easternmost end, an area which is comparable to that East of Cerro Matías.

107. The National Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*), the National Historic Reservation Act of 1966 (16 U.S.C. § 470 *et seq.*), the Historic Sites Act of 1935 (16 U.S.C. § 461 *et seq.*), and the Antiquities Act of 1906 (16 U.S.C. § 431 *et seq.*).

108. The Military Construction Authorization Acts of 1971 (P.L. 91–511), 1972 (P.L. 92–145) and 1974 (P.L. 93–166).

109. "Sec. 611. (a) The Secretary of Defense is directed to undertake a study and to prepare a report on the weapons training now being conducted in the Culebra complex of the Atlantic Fleet Weapons Range. This study shall consider all possible alternatives, geo-

Defense to study and report to Congress on the weapons training that was being conducted in Culebra with a view to considering "all possible alternatives, geographical and technological, to the training . . . taking place in the Culebra complex." The report should "contain specific recommendations for . . . moving all or a part of such activities to a new site or sites . . . ." In preparing this report the Secretary was required to consult with the people of Culebra, the Government of Puerto Rico, and with appropriate Federal agencies. Furthermore, the Navy was directed to avoid any increase or expansion of its activities in the Culebra complex.

On January 11, 1971, a document entitled "Agreement" was signed by the Secretary of the Navy, John H. Chafee, the Governor of Puerto Rico, Luis A. Ferré, the President of the Puerto Rican Senate, Rafael Hernández Colón, and the Mayor of Culebra, Ramón Feliciano. This document principally dealt with various self-imposed operational restrictions by the Navy and contained a promise by this agency "to continue to investigate both technological and geographical alternatives to the training done around Culebra."

On April 1, 1971, in compliance with the requirements of Section 611(b) of Public Law 91–511 the Secretary of Defense, Melvin R. Laird, forwarded to the Congress and the President a report on the weapons training then being conducted in the Culebra complex. As a result of this report the Secretary ordered, among other things, the cessation of explosive bombardment in the northwest peninsula of Culebra as of January 1, 1972.

Later that year Congress enacted the Military Construction Authorization Act of 1972 (P.L. 92–145; 85 Stat. 394), in which the Secretary of Defense was directed to prepare "a detailed feasibility study of the most advantageous alternative to the weapons training now being conducted in the Culebra Complex of the Atlantic Fleet Weapons Range." § 207, 85 Stat. 401. The standards to be used by the Secretary in determining the most advantageous alternatives were "cost, national security, the operational readiness and proficiency of the Atlantic Fleet, the impact on the environment, and other relevant factors." Id. This report was to be completed by December 31, 1972, and submitted, together with the Secretary's recommendations, to the President and to the chairmen of the Com-

---

graphical and technological, to the training now taking place in the Culebra complex, and shall contain specific recommendations for, together with the estimated costs of, moving all or a part of such activities to a new site or sites, and appropriately modifying such activities to minimize danger to human health and safety. In addition, such study shall consider the feasibility of resettling the people of Culebra to another location in the Commonwealth of Puerto Rico, the cost of such a move, and the attitude of the people of Culebra to a generous resettlement plan that would have to be approved by a majority of the qualified electors of Culebra in a plebiscite. In preparing such study, the Secretary is directed to consider the impact of each of the alternatives on:

(1) the safety and well-being of the people who live on Culebra;

(2) the natural and physical environment of Culebra and adjoining cays and their recreational value;

(3) the development of a sound, stable economy in Culebra;

(4) the unique political relationship of Culebra and Puerto Rico to the United States;

(5) the operational readiness and proficiency of the Atlantic Fleet; and

(6) National security.

(b) In preparing the report required by the section, the Secretary shall consult with the people of Culebra, the Government of Puerto Rico, and all appropriate Federal agencies having jurisdiction or special expertise on the subject matter involved. The report required by this subsection shall be transmitted to the President of the United States and to the chairmen of the Committees on Armed Services of the Senate and the House of Representatives no later than April 1, 1971.

(c) Pending the completion of the report required by this section and its review by the President of the United States, the appropriate committee and the Congress, the Department of Navy is directed to avoid any increase or expansion of the present weapons range activities in the Culebra complex and, wherever possible, without degrading the activities, to institute procedures which will minimize interference with the normal activities and the solitude of the people of Culebra." 84 Stat. 1225.

mittees on Armed Services of the Senate and the House of Representatives.

This study was in fact submitted by Secretary Laird on December 27, 1972. It showed that the requirements for the Inner Range of the Atlantic Fleet Weapons Range, *which then included both Culebra and Vieques,* would not change substantially through 1985. The study predicted, however, a shift in the kind of operations conducted: naval gunfire support training, which was conducted mostly in the northwest peninsula of Culebra, was projected to decrease, while air-to-grounds weapons training, which was principally carried out on Vieques and several rocks and cays west of Culebra, were forecast to increase. Of the five alternate sites studied none was deemed superior to Culebra, although based on the criteria given, Vieques was considered the most advantageous of the alternate sites. However, transferring to Vieques would involve the relocation of the "Culebra training targets to the east end of Vieques with one air-to-ground target two miles off the northwest tip of Vieques." The Secretary did not recommend this alternative as it was deemed to "significantly reduce the capability of the Inner Range and [to] transfer the training activity from an island with 700 inhabitants to one with 7,000 inhabitants", a situation which the Secretary discarded as not being a prudent course of action. The Secretary, however, indicated that the requirements of weapons systems and training changed with time, and thus the Navy would remain abreast of developments that would modify the study's conclusions, i. e., the Navy was keeping its options open.

Thereafter, in May, 1973, the new Secretary of Defense, Elliot Richardson, indicated to the Secretary of the Navy that in his opinion it was in the long-range interest of the Department of Defense to move the Navy training activities by July 1, 1975 from the Culebra complex *to the islands of Desecheo and Monito,* uninhabited islands lying in the Mona Passage, off the West coast of Puerto Rico, and a part thereof. The Secretary stated that *this* move was contingent upon Congress appropriating the funds and on working out "a satisfactory overall arrangement . . . with the Government of Puerto Rico for carrying out the proposed move and for insuring the long-term continuation of the Atlantic Fleet Weapons Range and the Fleet Marine Force Training area."

Later in 1973 Congress enacted the Military Construction Authorization Act of 1974 (P.L. 93–166, 87 Stat. 668)[110] appropriating

110. "Sec. 204. (a) In order to facilitate the relocation of the ship-to-shore and other gun fire and bombing operations of the United States Navy from the island of Culebra, there is hereby authorized to be appropriated the sum of $12,000,000 for the construction and equipage of substitute facilities in support of such relocation.

(b) The relocation of such operations from the northwest peninsula of the island of Culebra is expressly conditioned upon the conclusion of a satisfactory agreement to be negotiated by the Secretary of the Navy, or his designee, with the Commonwealth of Puerto Rico and reported to the Committees on Armed Services of the Senate and the House of Representatives prior to execution of such agreement. The agreement shall provide, among other things, that the Commonwealth of Puerto Rico shall insure that (1) Commonwealth lands suitable for carrying out operations of the type referred to in subsection (a) will be made available for the long term continued use of the Atlantic Fleet Weapons Range and Fleet Marine Forces training areas

by the Navy, including, but not limited to, present areas and facilities on the Island of Vieques, and (2) any proposed facility or activity which would interfere with the Navy training mission will not be undertaken, including the proposed deep water super-port on the Island of Mona, in the event that such agreement includes the use by the Navy of such island or the area adjacent to such island.

(c) Notwithstanding any other provision of law, the present bombardment area on the island of Culebra shall not be utilized for any purpose that would requirement decontamination at the expense of the United States. Any lands sold, transferred, or otherwise disposed of by the United States as a result of the relocation of the operations referred to in subsection (a) may be sold, transferred, or otherwise disposed of only for public park or public recreational purposes.

(d) The funds authorized for appropriation by the section shall remain available until expended." 87 Stat. 668–669.

$12,000,000 to facilitate "the relocation of the ship-to-shore and other gun fire and bombing operations [from Culebra, and for the] construction and equipage of substitute facilities in support of such relocation." Section 204(b) of this statute then provides that "[t]he relocation of such operations from the northwest peninsula of the island of Culebra is expressly conditioned upon the conclusion of a satisfactory agreement to be negotiated by the Secretary of the Navy . . . with the Commonwealth of Puerto Rico and reported to the Committees on Armed Services of the Senate and the House of Representatives prior to execution of such agreement." The law further required that this agreement bind the Commonwealth of Puerto Rico to insuring that *Commonwealth lands* suitable to carrying out the relocated operations would be made available for long term continued use of the Atlantic Fleet Weapons Range and the Fleet Marine Forces Training area, "including, but not limited to, present areas and facilities on the Island of Vieques." The agreement also had to have a provision compromising the Commonwealth to refrain from any activity that would interfere with the Navy's training mission, including the building of a then proposed deep water super-port on the island of Mona (which is in the vicinity of Monito and Desecheo island), in the event the agreement included the use of said island or nearby areas.

On June 22, 1974 the Secretary of State, Henry Kissinger, in a confidential memorandum to the Secretary of Defense, informed him that President Nixon had decided to end weapons training activities in Culebra by July 1, 1975 and on the Culebra Cays by December 31, 1975. The Secretary of Defense was directed to consider and select alternative sites. "The selection of the *new* site, if . . . in Puerto Rico, [would] be contingent on its being acceptable to the Commonwealth, and the Secretary of Defense should so inform the Governor of Puerto Rico." (Emphasis supplied).

Although we can well imagine that the above-described sequence is but the "tip of the iceberg" of the many incidents that culminated in the Culebra cease fire, they are the mainstay of Plaintiffs' contentions and the principal sources of evidence on the record.

Considering these events in the most favorable light to Plaintiffs' contentions, we cannot say that they convince us of the existence of any "agreement" on the part of Defendant Navy not to transfer operations to Vieques, even assuming that such an "agreement" would be legally enforceable or that the Plaintiffs would have proper standing to allege its "violation." The very existence and contents of the January 11, 1971 document, which deals with matters of relative unimportance and ambiguity, militates against our concluding that Defendant Navy would reach a binding agreement to grant the Commonwealth veto powers over its Vieques exercises, without some specific written document to such effect. When we consider the unquestionable proof that Defendant Navy was at the time carrying out at least some of the Culebra operations also in Vieques, it makes it even more unlikely that they would agree to so seriously compromise the Vieques operations, without a substantial *quid pro quo* that would ensure the continuity of the training operations somewhere.

■ The above-quoted internal directives of the various members of the Executive, even if we assume them to have been issued at the express order of the President, are not such orders as give rise to a private cause of action. *Zabala Clemente v. United States,* 567 F.2d 1140 (C.A.1, 1977), at 1144:

". . . Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government's conduct is in the context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff, but not necessarily a legal duty to the citizenry."

Furthermore, these directives, as well as the language in the various Appropriation Acts, cannot be taken out of the context of the circumstances surrounding them.

The above-described chain of events demonstrates that the Commonwealth and the Navy were negotiating for *additional Commonwealth lands* in substitution for the Culebra operations, and that eventually agreement could not be reached as to those lands, which more specifically were the islands of Mona, Monito and Desecheo.[111] Congress appropriated $12,000,000 for the purchase of those islands or similar Commonwealth lands, and it wanted to be sure that if it spent these sums in moving from Culebra, the Commonwealth would not do anything in the future to jeopardize these relocated facilities or the "present areas and facilities on the island of Vieques." To interpret the Appropriation Acts as granting the Commonwealth a veto power over Naval operations in Vieques, even assuming its constitutional validity,[112] would not only require a strained construction of these statutes but would, because of the unusual nature of the same, necessitate a more specific mandate to said effect.

It is interesting to note that Plaintiffs have presented no allegation or proof that

111. The Legislative history of the Military Construction Authorization Act of 1974 reveals the following:

Discussion of § 204 commenced in the Senate on September 13, 1973. It was sparsely debated and passed quickly. As passed in the Senate it read

"Sec. 204. In order to permit the execution of an order of the Secretary of Defense, dated May 24, 1973, that the Department of the Navy transfer all Atlantic Fleet Weapons range activities now conducted on or near the island of Culebra to the islands of Desecheo and Monito, not later than July 1, 1975, there is hereby authorized to be appropriated the sum of $12,000,000 for construction of an equipment for substitute facilities, such sums to be available until expended." 119 Cong. Rec. 29651–52 (1973).

On October 11, 1973 the House of Representatives considering the Military Construction Appropriations Act as a whole completely deleted the above section. See House Bill at 119 Cong.Rec. 34200–207. As a result of a conference between committees of the House and Senate a new adjusted authorization bill issued. The Report of the Joint Conference stated the Culebra problem thus:

"The Senate included in their bill authorization for $12 million to relocate the ship-to-shore and other gunfire and bombing operations of the U.S. Navy from the Island of Culebra. The provision was added during a mark-up without any hearing or testimony being taken in support thereof. The House Bill contained no such provision.

This provision in the Senate bill caused much discussion and debate among the conferees regarding the feasibility of relocating this activity from Culebra to the Islands of Desecheo and Monito. This subject has been the subject of considerable concern in both the House and Senate for the last several years. The House conferees were privileged to have a conference with the Governor of Puerto Rico, the Resident Commissioner and the Mayor of Culebra prior to final conference with Senate conferees.

The restrictive language in Section 204 is a result of discussion with the Governor and others and the conferees believe it provides sufficient protection to the Navy upon relocation of ship-to-shore gunfire operations from Culebra to the other Islands mentioned.

The House receded with an amendment." 119 Cong.Rec. 36857.

The result was the Bill as enacted at 87 Stat. 668.

The Legislative History of the Military Construction Appropriations Act of 1970 reveals that as originally passed in the House there was no section regarding the Culebra transfer. 116 Cong.Rec. 16255, at p. 16263; see also p. 16272. On reaching the Senate § 611 was added. 116 Cong.Rec. 34041. After a joint conference, the section passed as it now reads at 84 Stat. 1225. 116 Cong.Rec. 36132.

Thus the history of the Appropriation acts clearly shows that Congress was referring to "Commonwealth lands", such as the islands of Monito and Desecheo, and not Vieques which is "Navy lands."

Furthermore, it does reveal that § 204 was intended to provide for a two part agreement. The Navy's leaving of Culebra carried with it a *quid pro quo* of transfer to other lands the Commonwealth would help provide. To find that no agreement now exists is just as indicative of the Commonwealth's failure to comply with its part of the bargain behind § 204.

112. Cf. *Springer v. Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1927); see generally, Dixon, "The Congressional Veto and Separation of Powers: The Executive on a Leash?", 56 N.C.L.Rev. 424 (1978); Leni, "Some Aspects of Separation of Powers", 76 Col.L.Rev. 371 (1976); Note: "Congress, the President, and the Power to Commit Forces to Combat", 81 Harv.L.Rev. 1771 (1968); see also *Buckley v. Valeo,* 424 U.S. 1, 120, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Defendant Navy has used any of the amounts appropriated pursuant to P.L. 93–166 in the Vieques facilities or otherwise. It would seem that Plaintiffs could easily have established any such spendings, if in fact they do exist, during the course of their extensive pretrial discovery or by inquiry with the General Accounting Office.[113] Cf. *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Conversely, in the Military Construction Authorization Act of 1976 (P.L. 94–107, 89 Stat. 551), Congress authorized the Secretary of the Navy to "establish or develop military installations and facilities by acquiring, constructing, converting, rehabilitating, or installing permanent or temporary public works, including land acquisition, site preparation, appurtenances, utilities, and equipment for the following acquisition and construction: . . . Atlantic Fleet Weapons Range, Roosevelt Roads, Puerto Rico, $2,128,000." That statute did not otherwise restrict the nature of the spending. See also, Military Construc-

tion Authorization Act, 1979 (P.L. 95–356, 92 Stat. 565, at 570).

Furthermore, the evidence of a "transfer" from Culebra to Vieques is far from clear. Although the record shows that some improvements were made to the Inner Range facilities in Vieques after 1975, not only are these relatively minor in nature, but none were to establish new targets, all of which were in existence prior to 1975.[114] Although there is no question in our mind but that there was an increase in the intensity of operations at Vieques after 1975, this in itself demonstrates that these operations were already taking place in Vieques prior to the Culebra closing.[115]

All of these statistics may be interesting reading, but they really are immaterial to the present issue.[116] Whether or not a transfer as such took place, the same cannot be the basis for a cognizable claim in this Court based on either the First or Fifth Amendment, as Plaintiffs have not shown that any such transfer has infringed any cognizable property interest or constitutional right,[117] particularly in view of our find-

---

113. See 31 U.S.C. § 103.

114. Target One (October, 1971); strafe target (October, 1971); Target Two (October, 1971); NGFS targets (November, 1973); helicopter past and observation post at Cerro Matías (December, 1969); microwave communication and electronic warfare radar simulator at Cerro

Matías (July, 1974); helicopter pad and electronic warfare radar-simulator at Monte Pirata (December, 1975); T.V. Bomb scoring facilities at Cerro Matías (November, 1976); radar for ship positioning and bomb scoring on Cerro Matías (May, 1977); shelters for patrol boats in East Vieques (September, 1976); boat ramps in east Vieques (September, 1978).

115.

| Artillery | Last 6 months in 1973 | 1974 | 1975 | 1976 | 1977 | First 6 Months 1978 |
|---|---|---|---|---|---|---|
| Hours | 324.1 | 387.4 | 272.7 | 289.0 | 39.6 | 132.0 |
| Rounds | 2297 | 29080 | 13266 | 8367 | 225 | Not available |
| Days | 20 | 83 | 24 | 26 | 5 | 6 |
| Naval Gunfire | | | | | | |
| Hours | 202.5 | 644.4 | 669.4 | 715.0 | 1016.9 | 559.7 |
| Rounds | 2099 | 7200 | 8265 | 7040 | 8700 | 3816 |
| Ships | 33 | 91 | 74 | 73 | 97 | 39 |
| Days | 39 | 95 | 85 | 88 | 115 | 49 |
| Air-to-Ground | | | | | | |
| Hours | 137.9 | 159.3 | 362.6 | 484.4 | 1518.1 | 819.9 |
| Rounds | 33779 | 49052 | 59219 | 30801 | 107,206 | 100.196 |
| Sorties | 861 | 309 | 1638 | 1141 | 3438 | 1924 |
| Days | 42 | 38 | 92 | 92 | 100 | 63 |

116. They may have a bearing to matters discussed later in this Opinion. See Section IV K.

117. That a cause of action may lie under either the First, *Paton v. La Prade,* 524 F.2d 862

(C.A.3, 1975), or the Fifth Amendment, *Jacobson v. Tahoe Regional Planning,* 566 F.2d 1353 (C.A.9, 1977), rev'd in part sub nom. *Lake County Estates Inc. v. Tahoe Regional Planning Agency, Inc.,* 440 U.S. 391, 99 S.Ct. 1171, 59

ings which negate the existence of an enforceable agreement or mandate.

### B. The restriction of waters in the vicinity of Vieques

Plaintiffs Medina et al. and Zenon et al. contend that the restrictions of certain areas of the surrounding waters of Vieques, previously described, interfere with their personal rights and are contrary to the "Foraker Act", 48 U.S.C. § 746 and the Federal Relations Act, 48 U.S.C. § 731 *et seq.*

Article I, § 8, Clause 3 of the United States Constitution accords to the Congress the power: "To regulate Commerce with foreign Nations and among the several states and with the Indian Tribes." Chief Justice Marshall laid down the broad outlines of the commerce power in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 195, 6 L.Ed. 23 (1824):

> "We are now arrived at the inquiry—what is this power? It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution."

In 1865, the Supreme Court in *Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713, 724, 18 L.Ed. 96, ruled that navigable waters are public property of the Nation:

> "Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose and to the extent necessary of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the Nation and subject to all the requisite legislation by Congress."

Further, the Supreme Court has consistently maintained that, insofar as the control over commerce was concerned, more specifically the Commerce Clause, *plenary power* remained in Congress. See, *National League of Cities v. Usery,* 426 U.S. 833, 840, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942).

The military's operational restrictions at Vieques were issued by the authority of the Secretary of the Army under the Rivers and Harbors Act of 1889, 33 U.S.C. § 1 *et seq.*[118] Sections 1 and 3 of Title 33 grant the authority to restrict access to waters in areas like Vieques. Generally, they commend to the sound judgment of the Secretary decisions on whether navigable waters should be restricted. His judgment is to be founded upon what "the public necessity may require for the protection of life and property." 33 U.S.C. § 1. The statute also provides for the issuance of Secretarial regulations, "[i]n the interest of the national defense, and for the better protection of life and property on the navigable waters of the United States" for waters under the jurisdiction of the United States likely to be endangered by target practice. 33 U.S.C. § 3.

As previously indicated in this opinion, the pertinent regulations respecting the target range at Vieques Island are promulgated at 33 C.F.R. § 204.234, establishing the danger zone, and 33 C.F.R. § 207.815, establishing the restricted areas. On their face they are properly issued and fall within the purview of 33 U.S.C. §§ 1 and 3.

Nowhere have Plaintiffs shown that these restrictions operate to unreasonably restrict the waters from fishing and other activities. The two areas of restricted waters—the one, off the coast in the area of the Naval Ammunition Facility, and the

---

L.Ed.2d 401 (1979), does not relieve a Plaintiff of the burden of establishing the requisite property right, *Roth v. Board of Regents,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), or other protected constitutional interests. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See also: *Lynch*

*v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

**118.** The Secretary of the Army is not named as a defendant herein.

other, off the coast in the Camp García area—extend only 1,500 yards offshore. As previously stated, the danger area around the eastern end of Vieques is activated only at times when the range is in operation. Fishermen's notices indicate the schedule of range activities for the following week, designating the areas to be closed and time periods of range activation. Fishing is permitted at all other times.

The Plaintiffs herein have presented absolutely no evidence that Defendant Navy has impermissibly or unilaterally expanded the areas authorized as a danger zone (33 C.F.R. § 204.234) or a restricted area (33 C.F.R. § 207.815). The navigable waters contiguous to Defendant Navy's weapons training range at Vieques are navigable waters of the United States, and they have been restricted in exactly the manner intended by law and regulations. The Plaintiffs' representations that the Federal Relations Act, 48 U.S.C. § 731 *et seq.*, negates Defendant Navy's right to operate in this area are based on a misreading of that law and are contrary to §§ 734 and 749 of the same. See *PFZ Properties, Inc. v. Train*, 393 F.Supp. 1370, 1382 (D.D.C., 1975). The waters of Vieques are legitimately restricted by the sovereign in order to protect Plaintiffs' "life and property." Cf. *United States v. Mowat*, 582 F.2d 1194, 1205 (C.A.9, 1978), cert. den. 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1939).

■ Since Plaintiffs have failed to demonstrate that the above restrictions are unreasonable, it is unnecessary for this Court to reach Plaintiffs' Fifth Amendment taking claims. Again, however, Plaintiffs have failed to demonstrate any property interest of theirs which has been invaded, and indeed, they have none (see *Feliciano*, supra, at 1363–1364), particularly since no one has a property interest capable of being "taken" under the Fifth Amendment, in the fish in the sea. *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977).

■ Finally, the Plaintiffs Romero Barceló et al. and Medina et al., allege that the United States military operations on the Island of Vieques constitute a denial of freedom of travel as guaranteed by the First Amendment of the United States Constitution. *Feliciano*, supra, at 1364 and 1365, is dispositive of these claims of purported loss of personal liberties. See also, *Kreitzer v. Puerto Rico Cars, Inc.*, 417 F.Supp. 498, 506 (D.P.R.1975), aff'd. 535 F.2d 140 (C.A.1, 1976). The evidence presented at trial demonstrates clearly that there is no significant restriction on travel or on use of the beaches around Vieques, particularly when we compare it with the factual situation that existed in the *Feliciano* case.

**C. Allegations that raise non-justiciable "political questions"**

■ Plaintiffs have contended that the training conducted at or around Vieques could be carried out at some other location or that the type of training could be changed or reduced, all without harm to the National defense. Further in line with this position Plaintiffs have steadfastly contended that these are matters that should be considered by the Court in this case. In our view, questions dealing with the level and type of training required to maintain the Navy at an adequate level of efficiency, or the determination of the relative merits of various training sites or similar issues, are purely "political" questions which are not justiciable unless we are concerned with whether specific legal standards have been violated (ex., whether the level of training violates environmental laws).

Although the principle of nonjusticiability is not expressly stated in the Constitution, it derives in part from the doctrine of separation of powers. Provision for the National defense is the responsibility of the executive and legislative branches:

"The President shall be Commander in Chief of the Army and Navy of the United States . . ." U.S. Const., Art. II § 2, cl. 1.

"The Congress shall have Power . . . To Declare War . . . To Raise and support Armies . . . To provide and maintain a Navy . . ." U.S. Const., Art. I, § 8, cls. 12–14.

Obviously, not every matter affecting the armed forces presents nonjusticiable issues. But there are instances when sound judicial policy dictates restraint. One of these instances is when the controversy presents a "political question." Chief Justice Marshall perhaps best expressed the role of the judiciary in this regard: "Questions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803).

The contours of a political question have been well defined by the Supreme Court:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

Under the aforementioned criteria, determinations regarding the level, type, and efficacy of naval training present "political" questions. Maintenance and directions of the Navy is constitutionally committed to Congress and the President. There is an obvious lack of standards which a court could employ to make its own determination concerning training. Parenthetically,

how would a court determine what training is needed or whether particular training is accomplishing its goal? See *United States v. American Telephone and Telegraph Company*, 179 U.S.App.D.C. 198, 204, 551 F.2d 384, 390 (D.C. Cir., 1976). In fact, how would a court decide what was the desired state of readiness without an initial policy determination from the branches of our government responsible for the conduct of our Nation's foreign affairs? See *Mitchell v. Laird*, 159 U.S.App.D.C. 344, 349, 488 F.2d 611, 616 (D.C. Cir., 1973); *Pauling v. McNamara*, 118 U.S.App.D.C. 50, 52–3, 331 F.2d 796, 798–9 (D.C. Cir., 1964), cert. den. 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964). Obviously, the independent resolution of such matters by the court would not express the respect due coordinate branches of government that are charged with the resolution of such matters. There would result not only embarrassment in the area of foreign relations if judicial pronouncements varied with the studied opinion of those to whom the Nation's defense is entrusted, but also a possibility of real harm if our allies question our ability to train our forces and our enemies interpret such contradictions as a sign of military weakness. The importance of this last consideration has been judicially recognized:

"The decision of the Secretary of War is not open to judicial inquiry. That is fortunate, for if it were open, the ensuing delay would delight our country's enemies." *United States v. 243.22 Acres of Land*, 129 F.2d 678, 683 (2d Cir., 1942). See also *Commonwealth of Massachusetts v. Laird*, 451 F.2d 26 (1st Cir., 1971); *Curran v. Laird*, 136 U.S.App.D.C. 280, 287, 420 F.2d 122, 129 (D.C. Cir., 1979).

The Supreme Court has acknowledged on numerous occasions that, in military matters, constitutional provisions have engendered a judicial rule of nonreviewability founded on the concept of separation of powers:

"But judges are not given the task of running the Army . . . Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be

scrupulous not to interfere in judicial matters." *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

"[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system." *Gilligan v. Morgan,* 43 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973).

"The responsibility for determining how best our Armed Forces shall attend to [the business of fighting or being ready to fight wars] rests with Congress, see U.S. Const., Art. I, § 8, cls. 12–14, and with the President." See U.S. Const. Art. II, § 2, cl. 1. *Schlesinger v. Ballard,* 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610 (1975).

See also *United States v. MacIntosh,* 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302 (1931); *Bertelsen v. Cooney,* 213 F.2d 275, 277 (5th Cir., 1954), cert. den., 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 674, rehearing denied, 348 U.S. 890, 75 S.Ct. 205, 99 L.Ed. 699 (1954); *Simmons v. United States,* 406 F.2d 456, 459 (5th Cir., 1969); *Feliciano v. United States,* supra, at 1366.

"Trained professionals, subject to the day-to-day control of responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility in the unlikely event he possessed requisite technical competence to do so."

*Gilligan v. Morgan,* 413 U.S. at p. 8, 93 S.Ct. at 2445.

## K. *The Environmental Impact Statement and the National Environmental Policy Act*

Plaintiffs claim that Defendant Navy is in violation of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (hereinafter called "NEPA"), because it has failed to prepare an environmental impact statement ("EIS") as allegedly required by Section 102(2)(C) of said statute. Defendant Navy's defense is two-fold: (1) that Plaintiffs are barred from bringing this action by the doctrine of laches, and (2) that Defendant Navy is not in violation of NEPA. The Statute establishes as follows: (42 U.S.C. § 4332):

"The Congress authorizes and directs that, to fullest extent possible: (1) . . . (2) all agencies of the Federal Government shall—

. . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statements, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental im-

pact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by Section 552 of Title 5, and shall' accompany the proposal through the existing agency review processes; . . ."

A determination of the issues raised herein requires a multi-stepped analysis, the threshold of which is a decision as to whether there is before us a recommendation or report on proposals for (1) legislation, or (2) major federal action. Only if either of these two matters is in question are we required to determine whether said proposal or report significantly affects the quality of the human environment. *Andrus v. Sierra Club*, —— U.S. ——, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

Because we are quite clearly not concerned with any proposed legislation, annual appropriation bills having been definitively excluded by *Andrus v. Sierra Club*, supra, from such a contention, we can immediately lay that possibility to rest.

We thus come to a determination of whether Defendant Navy's activities in Vieques are a "recommendation or report on proposals for . . . major Federal actions." This literal approach, however, places a mistaken emphasis on the present day activities rather than on how they were promulgated.

First of all, it is obvious that Defendant Navy's activities in Vieques are the *product* of "recommendation[s] or report[s] on proposals for . . . major federal action." Secondly, the magnitude of the capital investment as well as the over-all nature of the present day activities characterize them as "major." *Jackson County, Missouri v. Jones*, 571 F.2d 1004 (C.A.8, 1978); *Sierra Club v. Hodel*, 544 F.2d 1036 (C.A.9, 1976); *City of Rochester v. United States Postal System*, 541 F.2d 967 (C.A.2, 1976); *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D. Mo.1975); *Prince George's County, Maryland v. Holloway*, 404 F.Supp. 1181 (D.C.D. C.1975); *Julis v. City of Cedar Rapids, Iowa*, 349 F.Supp. 88 (D.C.Iowa 1972).

■ Although the proposals for much of this action predates the passage of NEPA in 1969, the Vieques operation is in effect part of an on-going project which admittedly, has never been the subject of an EIS. In our opinion, the on-going activities must be the subject of an EIS notwithstanding that the proposals for said actions may have originated in part, prior to 1969, because it is clear that Congress did not intend to exempt pre-NEPA recommendations if they have post NEPA impacts. *Lathan v. Brinegar*, 506 F.2d 677, 689 (C.A.9, 1974); *Life of the Land v. Brinegar*, 485 F.2d 460, 466 (C.A.9, 1973), cert. den. 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Jones v. Lynn*, 477 F.2d 885, 889 (C.A.1, 1973). See S. Report No. 91–296, 91st Cong., 1st Sess. 21 (1969); 40 C.F.R. 1500.13; Cf. *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

Considering that Section 102(2)(C) of NEPA, requires the filing of an EIS only if the Federal actions "significantly [affect] the quality of the human environment", and less our present ruling be misconstrued when considered with prior findings in this case (which in synthesis hold that Defendant Navy's activities do not generally run contrary to the various environmental statutes that have been raised by Plaintiffs), we specify that our present ruling is based on the regulations enacted to implement NEPA.

The regulations of the Council on Environmental Quality, in identifying major actions significantly affecting the environment, state (40 C.F.R. 1500.6(a)):

"The statutory clause 'major federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and

projects in the area, and further actions contemplated. Such actions may be localized in their impact, but if there is *potential* that the environment may be significantly affected, the statement is to be prepared. Proposed major actions, the environmental impact of which is *likely to be highly controversial,* should be covered in all cases . . ." (Emphasis supplied).

The regulations promulgated by the Department of Defense in compliance with NEPA, in identifying major actions significantly affecting the quality of the human environment, indicate (32 C.F.R. 214.7(a)). ". . . In making a judgment in a particular case, it will be necessary for the proponent of the action to assess the expected environmental effects of the actions in conjunction with the intent of the National Environmental Policy Act (NEPA) as implemented by the Council on Environmental Quality (CEQ). It is essential that all the environmental effects of an action be assessed, whether those effects are adverse or beneficial. In determining whether or not the effects of an action are significant, the proponent must evaluate the nature and degree of all effects on the environment. *These may be significant even though the environmental effect of the proposed action will be beneficial.* (Emphasis supplied).

Contra: *Hanly v. Kleindienst,* 471 F.2d 823, 830 (C.A.2, 1972), cert. den. 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Cross-Sound Ferry Services, Inc. v. United States,* 573 F.2d 725, 731 (C.A.2, 1978).

At the very least, Defendant Navy is required to show that it adequately consulted with other agencies, and must establish a reviewable environmental record to support its threshold negative determination as to the necessity for preparing an EIS, if that be the case. *Friends of the Earth v. Butz,* 406 F.Supp. 742 (D.Mont.1975), rem. for mootness 576 F.2d 1377 (C.A.9, 1978); *Mid-Shiawassee Cty. Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D.Mich.1976), aff'd 559 F.2d 1220 (C.A.6, 1977); *Sierra v.*

*Morton,* 169 U.S.App.D.C. 20, 514 F.2d 856 (C.A.D.C.1975), *cert. dism.* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 105 (1976), rev. on other grds. 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Maryland-National Capital Park and Planning Commission v. U. S. Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (C.A.D.C.1973); *Arizona Public Service Co. v. Federal Power Commission,* 157 U.S.App.D.C. 272, 483 F.2d 1275 (C.A.D.C.1973); *Smith v. City of Cookeville,* 381 F.Supp. 100 (D.C.Tenn.1974).

The issue of laches is properly a question to be dealt with in connection with the appropriateness of the remedy, rather than substantively.

## V. *The Remedy*

The Court has found:

(1) That Defendant Navy is in violation of the Federal Water Pollution Control Act, *supra,* by reason of its lack of a NPDES permit to cover the occasional release or firing of ordnance into the waters of Vieques,

(2) That Defendant Navy is in violation of Executive Order 11593, *supra,* by reason of its failure to nominate to the Secretary of the Interior various sites in Vieques that may be eligible for listing in the National Register of Historic Places, and/or by its failure to seek the opinion of the Secretary respecting said eligibility, and

(3) That Defendant Navy is in violation of the National Environmental Policy Act, supra, by its failure to file an environmental impact statement in connection with its activities in and around Vieques.

Plaintiffs urge the issuance of an injunction against Defendant Navy prohibiting further military activities in Vieques until such time as there is compliance with all such violations.

The issuance of an injunction in the federal courts is governed by general principles of equity. *Stringer v. United States,* 471 F.2d 381, 384 (C.A.5, 1973), cert. den. 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973). See generally, "Developments in the Law-Injunctions", 78 Harv.L.Rev. 994 (1965).

■ Perhaps the most significant single component in the judicial decision whether to exercise equity jurisdiction and grant permanent injunctive relief, is the court's discretion. Being an extraordinary remedy, it is not granted routinely.

"We are dealing here with the requirements of equity practice with a background of several hundred years of history. . . . *The historic injunctive process was designed to deter, not to punish.* The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied."

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944), cited in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), emphasis added in that case.

"In shaping equity decrees, the trial court is vested with broad discretionary power . . . Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' . . .

"In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots."

*Lemon v. Kurtzman*, 411 U.S. 192, 200–201, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). See *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

■ If this balancing of competing interests is required where constitutional rights are at stake, can it be seriously argued that this Court should have a different standard where statutory matters are at issue? We think not. See *Essex County Preservation Association v. Campbell*, 536 F.2d 956, 962 (C.A.1, 1976); *Aluli v. Brown*, 437 F.Supp. 602, 611 (D.C.Haw.1977), rev. in part, 602 F.2d 876 (C.A.9, 1979); *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 753–754 (C.A.2, 1977); *Ohio v. Callaway*, 497 F.2d 1235 (C.A.6, 1974); *Conservation Society of Southern Vermont v. Secretary of Transportation*, 508 F.2d 927 (C.A.2, 1974), vacated on other grounds and remanded, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Environmental Defense Fund, Inc. v. Froehlke*, 477 F.2d 1033 (C.A.8, 1973).

The courts in construing environmental statutes such as NEPA have consistently suggested that the relief afforded be a product of balancing of equities. See *Silva v. Romney*, 473 F.2d 287 (C.A.1, 1973); *Environmental Defense Fund, Inc. v. Armstrong*, 352 F.Supp. 50 (N.D.Cal.1972), aff'd 487 F.2d 814 (C.A.9, 1973), cert. den. 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1973), reh. den. 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 319 (1974); *Minnesota Public Interest Research Group v. Butz*, 358 F.Supp. 584, 625 (D.Minn.1973), aff'd 498 F.2d 1314 (C.A.8, 1974) (*en banc*); *East 63rd Street Association v. Coleman*, 414 F.Supp. 1318, 1329 (S.D.N.Y.1976), aff'd by order 538 F.2d 309 (C.A.2, 1976); Cf. *Flint Ridge Dev. Co. v. Scenic Rivers Assn.*, 426 U.S. 776, 787–788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) reh. den. 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 159 (1976); *Aluli v. Brown*, supra.

■ There are various reasons why injunctive relief is not the appropriate remedy in this case.

To begin with, it is clear in our mind, as previously expounded in this opinion, that the activities of Defendant Navy are not causing any appreciable harm to the Vieques ecology. *Aluli v. Brown*, supra, at page 611. The violations which we have

found, are in substance technical violations, which must be cured, but do not require the drastic treatment suggested by Plaintiffs. Furthermore, there does not appear any reason why their rectification can not be accomplished in a relatively short period of time. Nor is there any logical connection between the accomplishment of this purpose and ordering a halt to the activities of Defendant Navy, other than as punishment, a purpose for which injunctive relief is not appropriate. See *Hecht Co. v. Bowles*, supra.

Additionally, the Court should take into consideration the delay by Plaintiffs in asserting their claims, as laches has been recognized to be a valid defense to similar suits. See *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (C.A.5, 1975); *Minnesota Public Interest Research Group v. Butz*, supra, p. 619; *Mansfield Area Citizens Group v. United States*, 413 F.Supp. 810 (D.C.Pa.1976); *Commonwealth of Pennsylvania v. Federal Maritime Commission*, 392 F.Supp. 795, 803 (D.C.D.C. 1975); *Save Our Wetlands Inc. v. U. S. Army Corps. of Engineers*, 549 F.2d 1021, 1026 (C.A.5, 1977), reh. den. 553 F.2d 100 (C.A.5, 1977), cert. den. 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Sierra Club v. Cavanaugh*, 447 F.Supp. 427 (D.S.D. 1978); *Woida v. United States*, 446 F.Supp. 1377 (D.C.Minn.1978); *Dalsis v. Hills*, 424 F.Supp. 784, 788 (D.C.N.Y.1976); *Organizations United for Ecology v. Bell*, 446 F.Supp. 535 (M.D.Pa.1978); *Shiffler v. Schlesinger*, 548 F.2d 96, 103 (C.A.3, 1977); *Centerview/Glen Avalon Homeowners Association v. Brinegar*, 367 F.Supp. 633, 639 (C.D.Cal.1973); *National Association of Government Employees v. Rumsfeld*, 418 F.Supp. 1302, 1304 (E.D.Pa.1976); *Smith v. Schlesinger*, 371 F.Supp. 559, 561 (C.D.Cal. 1974); *City of Rochester v. United States Postal Service*, 541 F.2d 967 (C.A.2, 1976); *Friends of Yosemite v. Frizzell*, 420 F.Supp. 390, 397 (N.D.Cal.1976); *Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714, 720 (S.D.Iowa 1974). In the present case, Plaintiffs have waited more than eight years since NEPA was enacted in 1969, more than six years since the Federal Water Pollution Control Act was enacted in 1972, and approximately seven years since Executive Order 11593 was promulgated, before filing the present actions notwithstanding that Defendant Navy has been conducting training operations in Vieques since World War II, and in its present intensity, since at least 1975. Plaintiffs' sudden awakening to rights that they have had for such long periods of time can not bring about a halt, and consequent disruption, to activities that have been taking place for at least an equal length of time. Although Plaintiffs' laches should not totally bar their claim we are of the opinion that it strongly militates against the granting of injunctive relief at present.

Lastly, we have not the slightest doubt but that the granting of the injunctive relief sought would cause grievous, and perhaps irreparable harm, not only to Defendant Navy, but to the general welfare of this Nation. It is abundantly clear from the evidence in the record, as well as by our taking judicial notice of the present state of World affairs, that the training that takes place in Vieques is vital to the defense of the interests of the United States.

From an economic and defense standpoint, the United States is an island which must import 90% of its strategic materials over the sea lanes of the World. Petroleum is the single most important commodity moved by sea, the primary sources in the Atlantic seaboard being the Middle East, and secondarily, South America. These sea lanes are also of vital importance in allowing the United States to meet its international obligations with 41 of the 43 nations with which it has mutual defense treaties.

Thus, our ability to maintain a well trained and effective naval force, even in time of peace, is essential to the National welfare.[119]

---

**119.** Considering the experience of the residents of Puerto Rico during the blockade in World War II, the ability to maintain free sea lanes to and from the Mainland would seem of some interest to the residents of this Commonwealth.

The Atlantic Fleet is responsible for providing naval forces throughout a geographic area that extends from as far north as the Arctic, to as far south as the Antarctic, as far east as Turkey and as far west as Mexico. These naval forces include air, submarine, surface, and Marine landing forces, all of which the Atlantic Fleet must combine and integrate. Because of allocated resources, and the extensive geographical area they must protect, these forces are at best marginal, and it is thus imperative that they be kept at the highest state of training possible.

Atlantic Fleet operations are centered around carrier-based high-performance attack aircraft, which according to expert testimony, is the only area wherein United States' naval forces outnumber those of our prospective adversaries. The training of these forces is a three-stage affair: the first six months, which takes place when a carrier returns from a cruise, is taken up with shore leave, maintenance, equipment installation, and the training of the ship's personnel to operate as a platform for aircraft. During this period most of the aircraft are shore-based. During the next six-months the air wing is embarked on the ship and the training is directed towards coordinating the airwing and the ship as a team. It is during this period that the ship is put through the full range of simulated combat conditions, including combined exercises with other components of the Atlantic Fleet, to bring it up to standards for actual deployment during the last 6–8 months of the training cycle.

The island of Vieques is the only place presently available wherein the Atlantic Fleet can conduct the full range of exercises under conditions similar to simulated combat. It is the only place which possesses the potential or existing capability to conduct combined exercises involving air-to-ground ordnances delivery, Marine amphibious assaults, anti-submarine warfare, surface-to-air missiles, close support bombardment, and electronic warfare; in short everything that a battle group would undertake to secure our sea lanes from inter-diction by hostile forces. Furthermore, being that the ultimate mission in combat is the delivery of live ordnance to the enemy, it is an essential element of training that the personnel be fully exposed to its use, both psychologically and in terms of actual skills. Vieques is the only location presently available wherein this training can be conducted within permissible peace time parameters.

Considering all of the above, the Court is of the opinion that under the present circumstances the continued use of Vieques by Defendant Navy for naval training activities is essential to the defense of the Nation and that the enjoining of said activities is not an appropriate relief for the correction of the cited statutory violations. Other remedy shall be fashioned. *Lemon v. Kurtzman,* supra.

Wherefore, it is ORDERED, that Defendant Navy, "with all deliberate speed", (*Brown v. Board of Education,* supra, 349 U.S. at page 301, 75 S.Ct. 753), proceed to:

1. File for and seek a NPDES permit for the release of firing of ordnance into the waters of Vieques;

2. Nominate to the Secretary of the Interior sites in Vieques that may be eligible for listing in the National Register of Historic Places, and/or seek the opinion of the Secretary respecting said eligibility, and further, take appropriate action for the protection of any such prospective sites pending decision as to their eligibility; and

3. Comply with the provisions of 42 U.S.C. § 4332(C).

All other claims are dismissed as well as all claims against Defendants in their individual capacities and against John Doe, Defendants.

A status conference shall be held before the United States Magistrate within 20 days for the establishment of a written time table for compliance with this Order, which time table shall be subject to the approval of the Court.

IT IS SO ORDERED.

Appendix to follow.

## APPENDIX A

MAP OF VIEQUES, PUERTO RICO*

SCALE 1:120,000

*NOTE: This map is part of the U.S. Geological Survey Map for Puerto Rico and Surrounding Islands, 1951, and has a scale of 1:120,000. The demarcations that have been added by the Court are intended for illustrative purposes only and are not necessarily cartographically precise.

LEGEND

Approximate boundary of naval reservation.

710

GOVERNMENT OF PUERTO RICO
DEPARTMENT OF THE INTERIOR
JORGE J. JIMENEZ, COMMISSIONER

UNITED STATES
DEPARTMENT OF THE INTERIOR
GEOLOGICAL SURVEY

TOPOGRAPHIC MAP
OF THE
ISLAND OF VIEQUES
PUERTO RICO

PAGE # 120

NOTE: This map is part of the U.S. Geological Survey map for Vieques, N. 1804-W 6516/6.5 x 19 (1951 Ed.) with a 1:30,000 scale. The demarcations that have been added by the Court are intended for illustrative purpose only and are not necessarily cartographically precise.